FREDERICK R. STEARNS & CO. v. RUSSELL.[1]

(Circuit Court of Appeals, Sixth Circuit. February 8, 1898.)

No. 471.

1. PATENTS—CONSTRUCTION OF CLAIMS.
Parts not named in a claim cannot be read into it for the purpose of making out a case of novelty.

2. SAME—COMBINATIONS.
A pill-dipping bar, with nipples against which the pills are held by suction created by exhaustion of the air from the interior of the bar, and which is manipulated by hand in dipping the pills, has no such relation to the pills and the gelatine bath as to form with them a patentable combination or mechanism.

3. SAME—ABANDONMENT OF CLAIMS.
One who has expressly abandoned and withdrawn another application, as a condition of getting the patent in suit, is estopped from contending for any construction of the claims which would, in effect, secure the matters so abandoned.

4. SAME—INVENTION—ANALOGOUS USE.
Where it requires substantially no change in an old device to adapt it to a new use, such adaptation is not patentable, however remote the new use may be, if no new force or mode of application be necessary in carrying on the use.

5. SAME.
The application of a device designed for lifting sheets of paper by exhausting the air in hollow points of contact therewith, to the lifting and holding of pills while dipping them in a gelatine bath, must be considered a mere analogous use, where no substantial change in the device is necessary, and especially where it appears that small articles not much unlike pills had previously been lifted in like manner. Potts & Co. v. Creager, 155 U. S. 597, 15 Sup. Ct. 194, distinguished.

6. SAME—INVENTION—PRIOR ART.
In estimating the amount of invention in a patented device, the court is bound to assume that the history of prior patents and machines having a bearing on the subject was known to the patentee, though, in fact, he may have been ignorant thereof, and actually exercised inventive faculty.

7. SAME—PILL-DIPPING DEVICE.
The Russell patent, No. 389,485, for a device for holding and dipping pills, consisting of a hollow bar, having a number of seats for the reception of pills, and adapted to have the air exhausted from its interior, so as to hold the pills to the seats by atmospheric pressure, is void for want of invention, in view of the prior use of similar devices for analogous uses.

Appeal from the Circuit Court of the United States for the Eastern District of Michigan.

John B. Russell filed his bill in equity in the circuit court against Frederick R. Stearns & Co., a corporation, seeking to restrain the defendants from further infringement of United States letters patent No. 389,485, issued on September 11, 1888, to the complainant, for a "device for holding and dipping pills," etc. The bill described the device by the following averment: "That your orator's patented device consists of a bar having a number of hollow seats for the reception of pills, which bar is adapted to be connected with an exhaust or sucking apparatus, so that the pills to be dipped are held to their seats by atmospheric pressure while being dipped." The answer set up the usual defenses of non-

[1] Rehearing denied February 8, 1898.

infringement, want of novelty, noninvention, and anticipation. The specification of Russell's patent contained the following: "Pills are now dipped in gelatine by the use of what is known as a 'needle bar,' viz. a bar in which are set a number of needles. The pills are impaled on these needles, partially dipped, are allowed to dry, and then removed from the needles usually by spring fingers, and the uncoated portion dipped. This, of course, makes a hole in each pill, and requires considerable manipulation. My invention consists in holding the pills on the dipping mechanism by atmospheric pressure, and I do this by maintaining a partial vacuum behind the pills when in position."

The drawings of the patent are below:

The specifications continue: "The drawings represent mechanism adapted to practice my process, in which B represents a bar having therein a cavity, E, and an orifice through one end of the bar, preferably somewhat tapering, the other end of the bar being closed. C represents a number of tubes set tightly in the top of the bar, B, and communicating with the interior cavity, E. In the modifications shown in Figure 3, the tubes, C, are omitted, and holes, H, are drilled through the bar into the cavity, E, terminating at their outer end in

concavities, C'. The end of each tube, C, also has a slight concavity, formed therein as indicated in dotted lines in Figure 5, to partially fit the pills or other objects to be held thereby. F represents a hollow tube adapted' to fit the orifice, A, and preferably tapered to fit said orifice. G represents a flexible tube, one end of which is connected with the tube, F, and the other end with any suitable suction apparatus, such as an exhaust fan, ejector, or pump. B' represents a portion of a board perforated with holes, O, slightly larger than the pills to be coated, bored so as to register with the tubes, C, or concavities C'." The operation of my invention is as follows: "The bar, B, is laid down with the tubes or concavities upward, and the board, B', is placed in a frame, so that the holes, O, register with the tubes, C. A number of uncoated pills are thrown upon the board, B', and some of them pass down through the holes, O, until they rest upon the end of tubes, C, when the surplus pills are brushed off, and the board removed, leaving a pill on the end of each tube or in each concavity, C'. The tube, F, is now pressed into the orifice, A; and, being connected with the suction apparatus, the air is exhausted from the cavity, E, and the pills are pressed firmly [against the ends of the tubes or concavities. The bar, B, is now lifted up, and turned over, and, in doing this, the tube, F, may be turned in the orifice, A], to avoid twisting tube, G; and the pills are then dipped in a gelatine bath as deeply as possible, without permitting the gelatine to come in contact with the tube, or to be sucked up through the tube or holes, H, by the vacuum. The pills are removed from the gelatine, the bar is given a slight rotary motion to distribute the gelatine evenly, and laid down with the tubes upward, in which position the tube, F, may be withdrawn; and the bar and pills are left to dry. When the coating has become dry, the bar is again connected with the suction apparatus. A similar bar is laid down with the holes or tubes up and with a perforated board, B', placed over it, as before described. The bar containing the partially coated pills is now raised, turned over, and the pills presented to the perforated holes in the board, and the suction apparatus is disconnected from the bar, when the partially coated pills fall on the ends of the tubes, and are held thereby. The suction apparatus is now connected to the second bar, the perforated board removed, and the uncoated portion of the pills dipped and dried, as before. It is evident that the gist of my invention consists in supporting the articles to be dipped by atmospheric pressure, instead of by mechanical means, and that the form and mechanical construction details of the specified apparatus shown can be considerably modified. What I claim as my invention and desire to secure by letters patent is: (1) In mechanism for dipping pills, a chambered dipping bar, having seats for pills which have atmospheric connection with an exhaust chamber in said bar, substantially as described. (2) In a mechanism for dipping pills, a dipping bar having seats for pills, and provided with passages forming atmospheric connection between said seats, and an interior exhaust chamber formed in said bar, and a tubular connection of flexible tube or section to permit the movement of said bar when the chamber is exhausted, substantially as described. (3) In combination with bar, B, and tubes, C, the tapering tube, F, and the flexible tube, G, connected a suction apparatus substantially as and for the purposes set forth." The words in brackets are not in the specifications, but they are, as counsel have suggested, needed to make the sense clear.

The first issue was as to the construction of the specifications and claims. The plaintiff's counsel contended that the invention was only a part of the mechanism used in coating pills of which the gelatine and its receptacle and the pills themselves were all elements, and that its novelty was to be determined in its relation to these other elements of the same so-called "mechanism." The contention for the defendant was that the patent was for a mere mechanical device to hold pills during the process of pill-dipping, and that it did not cover a combination with other appliances used in pill-dipping; that the patent was not for a process, but for a tool. To sustain this view, defendant introduced the file wrapper and contents of the patent in suit, and also of an application filed by the complainant, "for a new and useful improvement in the process for dipping pills." In the latter application he described the method of dipping the pills very much as it is set forth in the specifications quoted above, and framed his claim as follows: "(1) The process of coating pills and other small objects, consisting in supporting them upon a dipping bar by atmospheric pressure while in the act of dipping, substantially as herein described." The application was rejected by the ex-

aminer in these words: "It being common to sustain pills for the purpose of dipping them by impaling the same upon pins attached to a bar, as is shown, for instance, by the patent of A. F. W. & F. A. Neymaber, No. 170,185, November 23, 1875 (sugar and salt, confectionery pill machines), and the use of a vacuum for sustaining articles in a similar manner to that shown in the present application being shown in the patents to D. H. Campbell, Nos. 297,495 and 297,496, April 22, 1884 (metal working buttons and clasps), the process claimed is regarded as lacking in patentability." Russell then amended his claim to read as follows: "The process herein described of coating pills and other small articles, which consists in holding them upon a dipping bar by atmospheric pressure, and, while so held, dipping the pills in a coating composition substantially as set forth,"—and pointed out the improvement in this process over the pill-impaling method, theretofore in use, by which a hole was made in each pill, and required considerable additional manipulation. The appellant further called attention to the fact that the Campbell patent related to a different art from that of coating pills with gelatine, being a machine for making buttons. The amended application was again rejected, with the statement that "the process claimed aside from the mere function of the apparatus is devoid of patentable novelty, in view of the patents, and for the reasons cited in the former office letter." The application was again amended, by inserting the following disclaimer: "I am aware that suction cups have been used in the manufacture of buttons and other like articles for the purpose of assembling the parts that go to make up such articles. Such, therefore, I do not broadly claim,"—and by striking out of the claim the words "other small articles." To this the office answered: "The process of dipping pills, regardless of the apparatus used, is shown by numerous patents, and acknowledged by the applicant to be old. The method of sustaining articles by means of atmospheric pressure the applicant concedes also to be old and well known, such having been shown in the patent previously cited. In view of the above-mentioned facts, it is believed, as stated in the last office letter, that the application presents no patentable process, and hence it must be for a second time, and finally, rejected."

At the same time that the application for the process patent was under consideration, Russell was pressing his application for the patent in suit. He called it an "improvement in mechanism for dipping pills." He was required to substitute for the word "mechanism" the word "device," and to add the word "holding," so as to make his claim of invention one for a device for holding and dipping pills. As a condition of obtaining the patent in suit, Russell was required to abandon his process application, which he did in the following letter, filed with the commissioner of patents:

"In compliance with the directions of the office, and for the purpose of having my application for mechanism for dipping pills serial No. 255,324 considered, I herewith withdraw my application for patent for process of dipping pills, filed November 16, 1887, serial No. 255,324.

"Yours, respectfully, John B. Russell."

Upon the issues of novelty and anticipation the complainant relied on the admitted facts that never before the use of the device in suit had its pneumatic principle been utilized in the pill-dipping art; that pill-dipping began in 1849; and that since that date some seven or eight patents for holding and dipping the pills had been taken out, in all of which were serious defects, which his device obviated. Of these prior devices, those in most general use were bars with rows of pins or points, upon each of which a pill was impaled and held for dipping. These devices always left holes in the gelatine pill, which had to be filled in some other way, or else left the pill covering defective. The complainant, further, to show both novelty and utility, relied on evidence, not contradicted, that since his device has been used by Parke, Davis & Co., large manufacturers of pills in Detroit, for pill-dipping, they have used it in making 129,000,000 pills a year, and have increased their manufacture and sales of pills very largely, as compared with the manufacture and sale of pills by their competitors who use the old devices.

Upon these issues, the defendants introduced witnesses to prove the common use of air exhaustion to maintain balls in ball valves against the mouth of an exhaust chamber, and they also introduced American and English patents to show a frequent utilization of the same principle.

The Campbell patent, of 1884, which, it will be remembered, was referred to by the patent-office examiner to show the want of novelty of the process applied for by complainant, was an improvement in button-making machines, in which co-operative dies were employed for uniting as many as five different parts to form a button, the improvement consisting in devices for feeding the several parts automatically into the dies successively, and in the proper order. The dies were in a circle inside the periphery of a revolving table, while the parts to be fed were in magazines outside the periphery of the table. The parts were transferred one at a time from their respective magazines to the dies by means of cupules or suckers, which were pipes suspended above the table, and communicating with a common exhaust chamber, and having such a swivel joint connection with the chamber as to permit their lower ends to swing from their respective magazines to the circle of the revolving dies. The construction of the machine was quite complicated in order to effect the necessary automatic co-operation of the parts; but the simple office of each cupule or sucker was to attach to its lower end a particular part of the button to be made, and to lift it from its magazine, and carry it around to a point where it could drop it into one of the revolving dies with which it would register. The lifting and holding of the part thus carried to the end of the sucker or cupule was effected by exhausting the air in the exhaust chamber connected by a flexible pipe with suction apparatus, and the dropping was accomplished by breaking the atmospheric connection between the vacuum chamber and the pipes of the cupules or suckers by means of automatically operated valves. Another cupule was used to lift the finished button from the die, and deliver it from the machine. The patentee said in his specifications: "Instead of relying upon mechanically organized grasping and delivering devices, operating after the manner of nippers, and in some cases after the manner of puncturing forks for feeding or delivering the parts to and removing the finished buttons from the dies, I employ cupules or 'sucking cups' with atmospheric pressure, made available at suitable proper intervals by a continuous partial vacuum mechanically induced, and an automatic control of said pressure adjacent to and affecting said cupules in their operation. So far as my knowledge extends, this pneumatic principle has never before been applied to button-making machinery, although I am aware that it has been employed in machines for making trunk nails having brass filled heads; but in said machines, instead of effecting the release of a 'filling' from a lifter by modifying the atmospheric pressure as in my machine, said release was effected by mechanically operated plungers; and instead of employing a continuous partial vacuum, as in my machine, the partial vacuum in said prior machine was intermittingly induced by a pump which was worked for each operator of the lifter. I am also aware that the pneumatic principle has heretofore been employed in twine balling machines for conveying tickets from receptacles to hollow sinking balling spindles by means of cupules or suckers; and I am still further aware that there have been employed in other connections suckers which embodied means within themselves for inducing a partial vacuum at each movement towards or upon the object to be lifted." The articles lifted in the Campbell machine were metal shells, metal collets, cloth covers, paper fillings and tufts, as well as the whole buttons. The machine for making trunk nails referred to by Campbell was covered by a patent to Zachariah Walsh, issued in 1865. The machine is a very complicated one. The things lifted by suckers or cupules were small circular tin or metal plates, and circular pieces of pasteboard of the same size.

In 1851, one Frearson had taken out an English patent for lifting by pneumatic suckers small pieces of metal, and delivering them into cutting, shaping, and pressing machinery. The same pneumatic principle was used in printing presses to lift sheets of paper, and convey them from one part of the machine to another. There were quite a number of devices of this kind. The one most important in this case was a patent for a feeding attachment for cylinder printing presses, issued to Sanford C. Cox, May 12, 1885. In this the paper was delivered into the press by a tubular carrier, Q, which itself was carried from the place of reception to the place of delivery, suspended in triangular slots of carrying levers, and moving over segmental tracks. The carrier was described as follows: "The underside of the carrier, Q, is provided with suction cups, S, which communicate with its hollow interior, and have secured around their edges the rubber rings, s, to cause them to adhere to the paper when the air is exhausted

from the carrier and cups. One end of the tubular carrier is closed, and the other end is connected by a flexible tube, T, with an air pump, which is not shown in the drawings, but which is operated from the cylinder or operating shaft of the press, and which is so constructed and arranged that it shall exhaust the air from the carrier when the latter reaches the paper table, and cease operation and permit air to enter the carrier when the latter reaches the end of its stroke. The ends of the segmental tracks, D, are vertical or abrupt, and the triangular slots, O, in the carrying levers, will permit the carrier to descend the required distance at either end, and will again raise or lift it at the beginning of the movement in the opposite direction. By this construction the suction cups will always descend squarely upon the paper, and will never fail to deliver it evenly and smoothly."

Fig. 3 of the drawings shows this tubular carrier:

A very similar device was shown in a paper separator, patented to Comly in 1853. "His invention," he said, "consisted in a method of feeding or supplying paper, sheet by sheet, from a heap through the agency of atmospheric pressure." His machine consisted of (1) an elevating table; (2) a roller; (3) an air pump or exhauster attached by a flexible tube or bracket to a horizontal tube pierced on the underside with any required number of small holes, in which he inserted small tubes of, say, one inch in length and caliber in proportion to the size of the horizontal tube and the power of the exhauster; (4) a supporting bar. The air was exhausted from the tube, C, at the moment when the tubes, Z, Z, Z, were nearest to the top sheet of paper, at which time the revolution of cam wheels raised the tube, C, with the sheet, and it was carried from the heap to any required point. Fig. 2 of the drawings, reproduced below, shows this tubular carrier:

R. A. Parker, for appellant.

Cyrus E. Lothrop and Ephraim Banning, for appellee.

Before TAFT and LURTON, Circuit Judges, and SEVERENS, District Judge.

TAFT, Circuit Judge, after stating the case as above, delivered the opinion of the court.

The first issue between the parties is whether the patent before us is to be regarded as a machine merely for lifting and holding pills, or as an element of a larger mechanical combination of parts used in the process of pill-dipping. It seems to be the view of the defendant and appellee that other things required to be used in dipping pills can be implied as elements of the claims, and that thereby the novelty of the invention will become clear from the circumstance that no device of any form embodying the pneumatic principle of complainant's bar had ever before been used in combination with pills and a gelatine bath. To imply as elements of a claim parts not named therein for the purpose of limiting its scope, so that it may be accorded novelty, is contrary to a well-settled rule of the patent law. It was proposed to limit a claim thus in McCarty v. Railroad Co., 160 U. S. 110, 116, 16 Sup. Ct. 240. The patent there under consideration was for a car truck bolster. Mr. Justice Brown, in delivering judgment for the supreme court, said (page 116):

"There is no suggestion in either of these claims that the ends of the bolster rest upon springs in the side trusses, although they are described in the specification and exhibited in the drawings. It is suggested, however, that this feature may be read into the claims for the purpose of sustaining the patent. While this may be done with a view of showing the connection in which a device is used, and proving that it is an operative device, we know of no principle of law which would authorize us to read into a claim an element which is not present, for the purpose of making out a case of novelty or infringement. The difficulty is that if we once begin to include elements not mentioned in the claim in order to limit such claim, and avoid a defense of anticipation, we should never know where to stop. If, for example, a prior device were produced exhibiting the combination of these claims plus the springs, the patentee might insist upon reading some other element into the claims, such, for instance, as the side frames and all the other operative portions of the mechanism constituting the car truck, to prove that the prior device was not an anticipation. It might also require us to read into the fourth claim the flanges and pillars described in the third. This doctrine is too obviously untenable to require argument."

But it is said that the claims of the patent in question here do contain a suggestion of such a combination in the opening words, "In pill-dipping mechanism." We think these words are only used to define the useful purpose to which the patentee intended his device to be devoted, and cannot bear the construction by which all the other substances and parts used in dipping pills may be considered as making up the combination claimed.

There is a still more serious objection to such a view in the fact that the other elements which it is sought to introduce into the claims do not, when taken in connection with the specified device in any proper sense, constitute a mechanism, or arrangement of mechanical parts that can be patented as such. The complainant's patent is for a pill-holding device, and nothing else. It is a tool for manual use. To the extent

that the pump or fan, the flexible tube, the chambered bar, and the tubes or nipples of the bar co-operate to hold the pills upon the tube or nipple ends against the force of gravity, they form a mechanism or machine; but, when considered in relation to the dipping process, this machine is merely a tool exactly as a pin would be a tool used by hand to impale a pill, and to dip it into gelatine. The gelatine and its receptacle are not co-acting parts of a mechanism, of which the bar is also a part. There is no relation between them at all, except as it is initiated and maintained by the voluntary manual and continuously guiding act of the human operator. It is no more proper to describe the dipping bar as a co-element in dipping mechanisms with the pill and the gelatine bath than it is to describe the ax as a co-element of the log and the chopping block in mechanism for splitting wood. Mechanism may be defined to be the arrangement and relation of the parts in a machine, and a machine is defined by Prof. Robinson, in his work on Patents (section 173), to be "an instrument composed of one or more of the mechanical powers, and capable, when set in motion, of producing, by its own operation, certain predetermined physical effects." Again, he says (section 175) that "a machine differs from all other mechanical instruments in that its rule of action resides within itself." Within these definitions, the chambered dipping bar, with its pill seats and the exhaust pump, is a machine for holding pills, and the bar, the chamber, the pump, the hollow pill seats, are parts of the mechanism, forming the machine operating upon the pills. But when the hand of the operator is needed to turn the bar over, and to carry it to the bath, and to dip the attached pills into the bath, the function of the bar, so far as it has relation to the bath and the dipping process, is that of a tool. Of course, we do not mean to say that various mechanical steps taken by means of different tools or machines, in operating upon a substance to transform it from one thing to another, may not be the subject of a patent; but in such a case the patent is for a process, and not for a machine. Cochrane v. Deener, 94 U. S. 780, 787, 788; Locomotive Works v. Medart, 158 U. S. 68, 75, 76, 15 Sup. Ct. 745. Whether such a process patent might have been valid for the steps in pill-dipping pointed out in complainant's specifications, we need not discuss, because the complainant, as a condition of getting the patent in suit, expressly abandoned and withdrew an application for just such a process patent, and he is thereby estopped from contending for any construction of his present patent which would, in effect, secure him the same thing. Sutter v. Robinson, 119 U. S. 530, 541, 7 Sup. Ct. 376; Shepard v. Carrigan, 116 U. S. 593, 6 Sup. Ct. 493; Leggett v. Avery, 101 U. S. 256. What we have to determine in this case, therefore, is whether complainant's chamber bar was a new invention. First. Was the bar itself new? Second. If not, did its use for holding pills involve the inventive faculty on the part of the complainant, who is conceded to have first conceived such use?

The Campbell machine, for making buttons, and the much earlier devices of Walsh, for making heads for trunk-nails, clearly disclosed the method of lifting, holding, and moving small articles, like pieces of metal, cloth, wood, and paper, from one place to another, by at-

85 F.—15

taching them to the ends of hollow tubes connected with an exhaust chamber, from which the air was withdrawn by a pump fan or other exhausting device. Such devices were part of a larger machine, and discharged their functions automatically and at regular intervals. Although the principle of their action, so far as lifting and holding these articles against the force of gravity was concerned, was exactly the same as that embodied in complainant's bar, their form was not precisely the same. The same principle was used in another art,— that of the printing press for lifting and delivering paper to the press; and in this art we find the complainant's dipping bar complete with hardly a variation. It appears satisfactorily that what is called the "tubular carrier" of the paper-delivering device of Sanford C. Cox, patented several years before complainant's application was filed, is substantially in the same form as complainant's bar, operates upon exactly the same principle, and if removed from the Cox machine, as it can be easily, will hold, carry, and dip pills in the same way. It appears that no change is necessary whatever in the Cox carrier to make it suited to pill-dipping except it may be a reduction in the size of the tubes or pill seats. Differences between the two bars or carriers are suggested: First, the exhaust chamber of complainant's bar is connected by a swivel joint to the flexible rubber tube leading to the air exhausting machine. This swivel joint is not in Cox's carrier. But the tube connected to the chamber of the carrier is flexible, and it is quite manifest that the flexibility of the tube, if sufficiently long, would permit the performance of the same function,—that of enabling the tube to be turned over, which is the office of the swivel joint in complainant's bar. Again, it is said that the ends of the Cox carrier tubes are not made of a semiglobular form, to form the pill seats, and have rubber rings about them. But it clearly appears that the model made according to the Cox carrier will hold the pills without such seats, and this, too, with or without the rubber rings, which, of course, were used to make the connection with the paper sheet more close. The very triviality of the differences dwelt upon only emphasizes the substantial identity of the two bars. The Comly carrier for sheets of paper, which is a much earlier device, also quite nearly resembles complainant's carrier in form and principle of operation; but the resemblance is not so close as that of the Cox carrier, and we need not further notice it.

The remaining question is, did it require the inventive faculty to conceive the use of the Cox carrier for pill-dipping, and to apply it to that art? It has long been settled that a mere use or function is not the subject of a patent, and also that "the inventor of a machine is entitled to the benefit of all the uses to which it can be put, no matter whether he conceived the idea of the use or not." Roberts v. Ryer, 91 U. S. 150, 157; Goshen Sweeper Co. v. Bissell Carpet Sweeper Co., 37 U. S. App. 555, 19 C. C. A. 13, and 72 Fed. 67, and cases there cited. It would seem to follow as a corollary to these two propositions that, where it requires substantially no change in the old device to adapt it to the new use, such adaptation cannot be the subject of a patent, no matter how remote and unthought of the

new use may be, provided no new force or mode of application be necessary in carrying on such use; otherwise, in case the device has been patented, the right of monopoly of the prior patentee is invaded by excluding him from a use of a machine which, by the rule stated and the authorities cited above, he is entitled exclusively to enjoy. If, however, the adaptation of the old machine to the new use involves a change in its form or operation, it may, by the changes and very newness of the use or function, become either a new machine or an improvement on the old machine, and be patentable as such; or the new use of the old machine may result in a new product, which is itself patentable; or the use may be a step in a new and patentable process. The general rule, however, is stated by Mr. Justice Gray, in delivering the judgment of the supreme court, in Pennsylvania R. Co. v. Locomotive Engine Safety Truck Co., 110 U. S. 490, 494, 4 Sup. Ct. 220, as follows:

"It is settled by many decisions of this court, which it is unnecessary to quote from or refer to in detail, that the application of an old process or machine to a similar or analogous subject, with no change in the manner of application, and no result substantially distinct in its nature, will not sustain a patent, even if the new form of result has not before been contemplated."

Tested by this rule, we cannot think that the device of the complainant was patentable. Cox's machine was applied to the lifting of sheets of paper by exhausting the air in the hollow points of contact with the paper. Its subject was the lifting of the paper against the force of gravity, without hooking or sticking devices. The same principle had been theretofore applied in lifting small articles, like buttons, nail heads, and their component parts. Complainant's machine is a reproduction of Cox's, and its use is to lift pills, and hold them against the force of gravity, without hooking or sticking devices. There is no change in the manner of operating the machine, and the result is not substantially distinct in its nature, because it is in each case the holding of the article against gravity while it is being lifted from one place to another,—in the Cox machine, from the pile of paper to the press; in the complainant's machine, from pill magazine to the bath, and thence to the drier. We cannot think that such a use is not an analogous use, although never until the complainant did it had such a device been applied to holding up pills while being dipped. There would be more ground for maintaining that the use was nonanalogous, if it were not that small articles quite like pills had been held up in the same manner. It is quite possible that the conception of the machine by the complainant was a real exercise of the inventive faculty on his part, because he did not know of the Cox or Comly devices, or of the Campbell and Walsh patents; but, in judicially estimating the amount of invention in a patented device, the court is bound to assume that the history of prior patents and machines, having a bearing on the subject-matter, was known to the patentee.

The case upon which complainant's counsel most rely is that of Potts & Co. v. Creager, 155 U. S. 597, 15 Sup. Ct. 194. In that case the patentee had taken the cylinder of a wood-polishing machine, containing a series of glass bars, fitted into longitudinal grooves in the

periphery of the cylinder, and, discarding the glass bars, had substituted others of steel, and provided the cylinder thus changed with an abutting roller, and then used it, not for wood-polishing, but for disintegrating clay. The supreme court held the patent valid. Mr. Justice Brown delivered the opinion of the court, and, in answer to the question whether these changes involved invention, he said:

"The answer to this requires the consideration of the often-recurring question, which has taxed the ingenuity of courts ever since the passage of the patent acts, as to what invention really is. When a patented device is a mere improvement upon an existing machine, and the case is not complicated by other anticipating devices, the solution is ordinarily free from difficulty. But, where the alleged novelty consists in transferring a device from one branch of industry to another, the answer depends upon a variety of considerations. In such cases we are bound to inquire into the remoteness of relationship of the two industries,—what alterations were necessary to adapt the device to its new use, and what the value of such adaptation has been to the new industry. If the new use be analogous to the former one, the court will undoubtedly be disposed to construe the patent more strictly, and to require clearer proof of the exercise of the inventive faculty in adapting it to the new use; particularly if the device be one of minor importance in its new field of usefulness. On the other hand, if the transfer be to a branch of industry but remotely allied to the other, and the effect of such transfer has been to supersede other methods of doing the same work, the court will look with a less critical eye upon the means employed in making the transfer. Doubtless, a patentee is entitled to every use of which his invention is susceptible, whether such use be known or unknown to him; but the person who has taken his device, and, by improvements thereon, has adapted it to a different industry, may also draw to himself the quality of inventor. If, for instance, a person were to take a coffee mill, and patent it as a mill for grinding spices, the double use would be too manifest for serious argument. So, too, this court has denied invention to one who applied the principle of an ice-cream freezer to the preservation of fish (Brown v. Piper, 91 U. S. 37); to another, who changed the proportions of a refrigerator in such manner as to utilize the descending, instead of the ascending, current of cold air (Roberts v. Ryer, 91 U. S. 150); to another, who employed an old and well-known method of attaching car trucks to the forward truck of a locomotive engine (Pennsylvania R. Co. v. Locomotive Engine Safety Truck Co., 110 U. S. 490, 4 Sup. Ct. 220); and still another, who placed a dredging screw at the stem instead of the stern of a steamboat (Atlantic Works v. Brady, 107 U. S. 192, 2 Sup. Ct. 225). In Tucker v. Spalding, 13 Wall. 453, the patent covered the use of movable teeth in saws and saw plates. A prior patent exhibited cutters of the same general form as the saw teeth of the other patent attachable to a circular disk, and removable as in the other, the purpose of which patent was for the cutting of tongues and grooves, mortises, etc. The court held that if what it actually did was in its nature the same as sawing, and its structure and action suggested to the mind of an ordinarily skillful mechanic this double use to which it could be adapted without material change, then such adaptation to a new use was not new invention, and was not patentable. Upon the other hand, we have recently upheld a patent to one who took a torsional spring, such as had been previously used in clocks, doors, and other articles of domestic furniture, and applied it to telegraph instruments, the application being shown to be wholly new. Electric Co. v. La Rue, 139 U. S. 601, 11 Sup. Ct. 670. So, also, in Crane v. Price, 1 Webst. Pat. Cas. 409, the use of anthracite coal in smelting iron ore was held to be a good invention, inasmuch as it produced a better article of iron at a less expense, although bituminous coal had been previously used for the same purpose. See, also, Steiner v. Heald, 6 Exch. 607. Indeed, it often requires as acute a perception of the relation between cause and effect, and as much of the peculiar intuitive genius which is a characteristic of great inventors, to grasp the idea that a device used in one art may be made available in another, as would be necessary to create the device de novo. And this is not the less true if, after the thing has been done, it appears to the ordinary mind so simple as to excite wonder that it was not thought of before. The apparent simplicity of a new device often

leads an inexperienced person to think that it would have occurred to any one familiar with the subject; but the decisive answer is that, with dozens, and, perhaps, hundreds, of others laboring in the same field, it had never occurred to any one before. The practiced eye of an ordinary mechanic may be safely trusted to see what ought to be apparent to every one. As was said by Mr. Justice Bradley, in Loom Co. v. Higgins, 105 U. S. 580, 591: 'Now that it has succeeded, it may seem very plain to any one that he could have done it as well. This is often the case with inventions of the greatest merit. It may be laid down as a general rule, though, perhaps, not an invariable one, that if a new combination and arrangement of known elements produce a new and beneficial result, never attained before, it is evidence of invention.' As a result of the authorities upon this subject, it may be said that, if the new use be so nearly analogous to the former one that the applicability of the device to its new use would occur to a person of ordinary mechanical skill, it is only a case of double use; but if the relations between them be remote, and especially if the use of the old device produce a new result, it may, at least, involve an exercise of the inventive faculty. Much, however, must still depend upon the nature of the changes required to adapt the device to its new use."

In the case at bar, it is true that the complainant's device has been very useful in the art of pill-dipping, and if that alone is to determine whether a use is analogous or nonanalogous, when an old device is used in another art, the complainant's device must be sustained as patentable. But it will be observed that Mr. Justice Brown, in this very carefully and cautiously worded discussion of the subject, includes, as very large elements to be considered in reaching a conclusion in any case, the changes in the old device required to adapt the old device to the new use, and the remoteness of the new use. Schreiber Co. v. Grimm, 43 U. S. App. 10, 19, 19 C. C. A. 67, and 72 Fed. 671. In the case he was considering, the changes were marked. The old device would have been wholly inoperative if applied as it was to disintegrating clay. In the case before us, no change was necessary at all, except simple disengagement from other parts of a larger machine, and a mere reduction in size of the holes in the contact tubes. In Potts & Co. v. Creager the old use was polishing wood; the new was disintegrating clay. They were obviously totally different and distinct purposes. Here the old use was lifting and holding paper and small articles, and the new was lifting and holding pills. We are of opinion that, notwithstanding the utility and success of the new application of the device to pill-dipping, the circumstances that no change of form was necessary in the new application, and that the functions or purposes new and old were not wholly different and distinct, but were substantially the same, make this a different case from Potts & Co. v. Creager, and lead to a different result. In Electric Co. v. La Rue, 139 U. S. 601, 11 Sup. Ct. 670, referred to by Mr. Justice Brown above, the invention was of a combination of parts making up a telegraph instrument, the novel element in which was a torsional spring. Such a spring took the place of elements which required the most delicate adjustment, and were always getting out of order. The spring had never before been an element in such a combination, and had never before discharged the same function. The case has no likeness to the one before us. In Colgate v. Telegraph Co., 15 Blatchf. 365, Fed. Cas. No. 2,995, it was held that the use by the patentee of an electric wire covered with gutta-percha to insulate it was not a double use though gutta-percha

had been used for protecting from abrasion or injury from without a metallic wire which was not used to conduct electricity. Here the new use involved a new force. The wire and the covering each discharged new functions, and the invention was manifestly a different one from that involved in merely covering wire to protect it. The cases of Williames v. McNeely, 64 Fed. 766, and Williames v. Barnard, 41 Fed. 356, cited for appellee, throw little light on the case at bar, because in those cases the patents were sustained on the ground that ingenuity was shown in devising the mechanism needed to apply the principle of the old machine to the new use.

The cases in which it has been held that an old machine applied to a new purpose is not a new patentable machine are so numerous that it would take too much space to cite them all. In addition to those already cited may be mentioned Howe v. Abbott, 2 Story, 190, Fed. Cas. No. 6,766; Bean v. Smallwood, 2 Story, 408, Fed. Cas. No. 1,173; Knapp v. Morss, 150 U. S. 221, 14 Sup. Ct. 81; Aron v. Railway Co., 132 U. S. 85, 10 Sup. Ct. 24; Ansonia Brass & Copper Co. v. Electrical Supply Co., 144 U. S. 11, 18, 12 Sup. Ct. 601; Trimmer Co. v. Stevens, 137 U. S. 423, 11 Sup. Ct. 150; Dunbar v. Tack Co., 4 Ban. & A. 518, Fed. Cas. No. 4,127a; Moffitt v. Rogers, 8 Fed. 147; Miller v. Foree, 116 U. S. 22, 6 Sup. Ct. 204; Manufacturing Co. v. Cary, 147 U. S. 623, 13 Sup. Ct. 472; Kay v. Marshall, 2 Webst. Pat. Cas. 36; Harwood v. Railway Co., 11 H. L. Cas. 654. The case of Manufacturing Co. v. Cary had some points of resemblance to the case before us. The patent there was for a process of restoring the resiliency of furniture springs by heating them to a great heat. The invention was said to have revolutionized the art, but it was held that the prior use of the same method for tempering wire clock bells and blued hair springs in marine clocks made the patented process only a double use, although the furniture and clock-making arts would not seem to be very nearly allied. Following language used in McClain v. Ortmayer, 141 U. S. 419, 428, 12 Sup. Ct. 76, the court said of the argument founded upon the extent to which the article had gone into use that, "while in a doubtful case the fact that a patented article had gone into general use is evidence of its utility, it is not conclusive even of that, much less of its patentable novelty." See, to the same point, Knapp v. Morss, 150 U. S. 221, 14 Sup. Ct. 81.

Prof. Robinson, in his valuable work on Patents (section 269), states the rule which he conceives to be applicable to a case like this as follows:

"Where an invention consists of a specific force applied in a specified manner, but without reference to specific objects, diversity of use may arise from a change of objects, the diversity being double use if the substituted object were already known as capable of substitution, but being a new invention if this susceptibility of that object were first discovered by its use."

Even judged by this rule, which is certainly more liberal than that laid down in many of the authorities, we cannot see how any other conclusion than that already expressed can be reached in the case at bar. It was known that pills had the same susceptibility of being held up against the force of gravity by pneumatic pressure that other small articles and that paper sheets had. Of course, pills had not

been so held; but, assuming a knowledge that paper, buttons, small pieces of cloth, metal, cardboard, and nail heads could be so lifted, there was nothing about a pill which would lead the ordinary observer to suppose that it was not equally susceptible to the same operation; hence the use of the same device for holding pills was a double use, and not a new invention.

A suggestion has been made that the pill, being rather soft and round, might suggest difficulties in the creation of a partial vacuum behind it, that would be absent in hard bodies, like buttons and nail heads, because the latter would make a closer contact with the cupule or sucker tube; but we cannot think that there is anything of substance in this suggestion. The question of a sufficient vacuum is only a matter of degree, and it was manifest that the difficulty, if any existed, might be obviated by a slight change in the form of the tubes at their ends, and in the power of the suction. The conclusion we have reached makes it unnecessary to consider the question of infringement. The decree of the circuit court is reversed, with directions to dismiss the bill.