**FORD MOTOR CO. v. PARKS & BOHNE, Inc.**

Circuit Court of Appeals, Eighth Circuit. September 30, 1927.

No. 7741.

1. Patents ⬥⟹176—Words "automobile transmission band," in claims for automobile brake, held merely to state environment, and did not sustain claim of novelty.

Words "automobile transmission band," in claims covering automobile transmission brake band, *held* merely to state environment in which device was to be used, and imported no structural elements into claims, so as to make out a case of novelty by creating new combination of old elements resulting in new and useful purpose.

2. Patents ⬥⟹58—On issue of patentability, law presumes inventor knew of all prior patents.

In determining whether invention is patentable, law presumes that inventor had knowledge of all prior patents.

3. Patents ⬥⟹27(1)—Application of old device to new use is not patentable invention unless so recondite and remote from original use as not likely to occur to skilled mechanic.

The application of an old device to a new use is not in itself a patentable invention, but it is only when the new device is so recondite and remote from that to which the old device has been applied or for which it was conceived that its application to the new use would not occur to the mind of the ordinary mechanic skilled in the art that his conception rises to the dignity of invention.

4. Patents ⬥⟹328—No. 1,198,090 and 1,198,091, for automobile transmission bands, held void for lack of invention.

White patents, No. 1,198,090 and 1,198,091, for automobile transmission bands, *held* void for lack of patentable novelty and anticipation.

Appeal from the District Court of the United States for the Eastern District of Missouri; Charles B. Davis, Judge.

Patent infringement suit by Parks & Bohne, Inc., against the Ford Motor Company. Decree for plaintiff, and defendant appeals. Reversed, with directions.

Frank Parker Davis, of Chicago, Ill. (Glen E. Smith, of Chicago, Ill., and Carr, Carr & Gravely, of St. Louis, Mo., on the brief), for appellant.

Ralph Kalish, of St. Louis, Mo., for appellee.

Before KENYON, Circuit Judge, and MOLYNEAUX and JOHN B. SANBORN, District Judges.

MOLYNEAUX, District Judge. Parks & Bohne, Inc., appellee plaintiff, filed its bill in equity in the District Court, seeking to restrain the appellant defendant from further infringement of United States letters patent Nos. 1,198,090 and 1,198,091, issued on September 12, 1916, to Thomas Locke White, for automobile transmission bands. Both patents relate to brake bands operating upon drums for the control of speeds, for reversing, and for retarding and stopping. The patents are not for the transmission mechanism, but only pertain to a detail in the construction of the band itself which allows the band to be removed and replaced more conveniently, saving time and labor. The District Court upheld the validity of the patents.

The errors relied upon are summed up by the appellant as assigned error in not decreeing invalidity for anticipation and lack of patentability in putting an old contrivance to use in a new environment, where it performs the same office as before; and also error in decreeing infringement of appellant's claims. Appellee is engaged in manufacturing and selling transmission bands for use in Ford automobiles of the manufacture of appellant. Formerly the band used in Ford transmissions had so-called ears, permanently riveted upon both ends. These ears are fixtures by which to lay hold of the ends of the band for the purpose of contracting it so as to apply brake friction to the drum and encircled by the band.

Appellee's improvement consists in making the ear at one end of the band detachable; the purpose of this being to make the band more readily removable and replaceable. This is an advantage and desirable, because in practice the constant use of the band in applying friction wears out the drum, making it necessary to frequently remove it for the purpose of renewal or relining. The casing of the Ford transmission mechanism is such that it snugly embraces the interior parts, and, with the ears riveted on both ends of the band, removal and replacement thereof required the removal of the upper half of the casing, and this required removal and replacement of a considerable number of associated parts, consuming considerable labor and time. By making one of the ears detachable, a band can be slipped out of the cap opening in the top of the same, thereby saving labor and time.

That the construction under consideration may be more readily visualized and compared with each other, we show them in the subjoined figures; in Figures 1 and 2, White's first and second ear on the band, in Figure 3, appellee's ear on the band, and in Figure 4, Brown & Sharpe's ear on the band.

We refer to patent No. 1,198,090 as the

first patent in suit and to patent No. 1,198,-091 as the second patent in suit.

It is appellant's contention that White's structure was anticipated by, and finds a complete response in, the Brown & Sharpe construction:

Fig 1.
1ST PATENT IN SUIT 1914

Fig 2
2D PATENT IN SUIT 1915

Fig 3.
DEFENDANTS CONSTRUCTION

Fig 4.
BROWN & SHARPE 1902

Referring to Figure 1, showing the ear in the first patent in suit, the outstanding portion of the detachable ear 12 has the same bifurcated or forked form as the old Ford riveted-on ear, but the base is specially fashioned for dovetailing into flanges 25 formed at opposite sides of the band 9 at one end thereof. This formation of the base and this flanging of the band provide for sliding the ear into position at the end of the band and interlocking it therewith against outward separation therefrom. The lateral projections 27 at the rear of the ear base, by abutting against the rear ends of the flanges 25, limit the sliding-on movement, and enable this ear to serve the same function as a riveted ear when a pull is applied to contract the band around the drum. At the same time, when occasion requires, the ear can be slid back out of engagement with the band flanges and taken away so that the band can then be removed from the casing by laying hold of the other riveted ear and working the then earless end around through the space between the drum and the casing.

Referring to Figure 5, portraying the ear in the second patent in suit, as before, the outstanding portion of the ear is of the customary bifurcated or forked form to co-operate with the usual operating devices just as a riveted ear does. Instead of the dovetail

formation of the first patent, a "keyhole slot and lug connection" is employed for interlocking the base of the ear with the band. The keyhole slots 25 and 26 are made in the band, and the studs or lugs 27 and 28 are secured in the base of the ear. The operation is the same as in any keyhole slot and lug arrangement. The heads of the lugs are put through the large ends of the keyhole slots and then relative lengthwise movement of the parts interlocks them.

In this construction of the second patent, a spring catch is used to prevent accidental backing off of the detachable ear. This catch consists simply in a thin spring strip 29 fastened at one end to the base by a screw 30, and having a pin or stud 31 at the other end, going through a hole in the base and engaging in one of the keyhole slots 26.

White did not create any new combination of elements making up an automobile transmission mechanism, nor any new mounting or encasing or controlling arrangement of the same. His contribution consisted solely in replacing one of two riveted-on ears on an old brake band or transmission band, by a detachable ear at one end of the band, thus securing the advantage of making the band more readily removable and replaceable.

He conceived that by this expedient, leaving the other things as they were, he could secure this improvement. We do not think this conception patentable invention. It was perfectly obvious that there was not space enough between the drums and the casing to permit an ear to be passed between them. This was apparent to any one, from the most casual observation; and the perception of replacing one of the pivoted-on ears by a detachable ear is mere mechanical facility, and does not require exercise of the inventive faculty.

Whether it was invention to devise such a form or means portrayed in the patents and set out in the claims thereof, whereby to accomplish detachability in the ear, we pass without discussion and without deciding, as in our view the prior uses and prior patenting and publication anticipate all that is claimed in these patents which could have any application to the appellant's construction. Ever since 1902 Brown & Sharpe Manufacturing Company of Providence, R. I., have had in use and public sale screw machines in which a brake band is used around a drum; the band having a detachable ear, as shown in Figure 4, hereinbefore portrayed.

The ear or angle plate of this band being the shorter one of the two ears shown in the illustration, Figure 4, above, is made detach-

able by forming its base with the keyhole slots to engage head lugs on the band. This is made slidably engageable with the band, the same as is claimed for the first patent in suit, and is so made by "a keyhole slot and lug" as is claimed for the White patent.

The purpose of making the ear detachable is the same in the Brown & Sharpe ear as in the White patents, namely, for convenience and economy in saving time and labor. It was stated in the catalogue illustrating the Brown & Sharpe construction:

"The space between the pulley and the bed $D$ of the machine was so limited, as illustrated at $E$, that the band of the brake of the form illustrated by Defendant's Exhibits Nos. 1 and 1A could not be passed around the pulley with both of the * * * angle plates attached to their respective ends of the band. One of the angle plates was therefore riveted permanently to one end of the band, but, at the other end, the angle plate was made detachable therefrom by providing the band proper with four outwardly projecting studs or rivets which were arranged to engage keyhole slots in the angle plate. The heads of the studs or rivets would be passed into engagement with the enlarged holes at the ends of these slots and then, upon moving the angle plate longitudinally on the band, the studs or rivets would be passed into engagement with the reduced portions of the slots, thereby holding the angle plate in assembled relation on the end of the strap. This construction permitted the band of the brake to be threaded through the small space around the pulley 21 with the detachable angle plate removed therefrom, after which the detached angle plate was engaged with the band in the manner hereinbefore described."

Mr. Kinealy, appellee's expert witness, testified as follows:

"XQ. I am assuming you have it rigid there (referring to the detachable ear or angle plate); then you would have to dismantle the machine to get it out. That would take more time than to do this performance (referring to detachment of ear and slipping band through space between pulley and bed)? A. Oh, yes; that is true."

Brown & Sharpe used this expedient on a brake band in a screw machine drive, and term the appliance a "spindle brake," whereas the patentee of the patents in suit used the same expedient on an automobile drive, and terms his appliance a "transmission band."

The other claims in patent No. 1,198,091, relate to the spring catch, whose office is to prevent the detachable ear from accidentally backing off from the end of the band.

The figure below illustrates the spring catch:

Fig 5.

2d PATENT IN SUIT 1915

The figure is a longitudinal section, showing the detachable ear in place on the band, the keyhole slots in the band are designated 25 and 26; the ear slots, 27 and 28; and the spring, 29; number 30 designating the screw, securing the spring 29 to the ear, and 31, designates the pin on the other end of the spring, and extending through the keyhole in the ear and into the keyhole slot, 26.

The Brown & Sharpe spindle brake does not use a safety catch for the detachable ear; that being nonessential in their case. However, examples of attachments slidably engageable, both by dovetailing a keyhole slot and lug connections, and the use of a spring catch with such attachments, are common in the arts. Such use of the spring catch is shown by Vaughn & Blaney in their patent No. 137,982. This shows a detachable handle of a sadiron, dovetailed to the base, and a spring catch secured to the under side of the handle and engaging in a depression in the base to hold the handle in place. The Mumby patent, No. 783,883, of 1905, shows a similar arrangement in a sadiron.

A third example of much the same thing may be seen in the British patent No. 7,425 of 1901, to Wrede, for "an improved fastening device for attaching together objects or parts of an object in a releasable manner."

This is illustrated as applied to a skate, and also as applied to a smoothing iron. In each instance the keyhole slot and lug connection is employed, and the spring catch is applied just as White applies it in the second patent in suit.

The spring in the Wrede patent is constructed on the same principle as the spring

in the White patent, and the action is the same as in the patent in suit. This Wrede patent shows a flat spring fastened at one end of the base of the detachable piece and at the other end carries a pin which fits a hole in the base and is attached to project into one of the keyhole slots. When the headed studs of the detachable piece have been put into the large portion of the keyhole slots and the piece is slid to engage those studs with the small portions of said slot, then the pin of the spring catch snaps into one of the keyhole slots. Appellee's expert testified as follows:

"XQ. Now, with reference to the matter of adding the spring catch, and considering this function of interlocking by relative sliding movement and locking by a spring catch, is that function any different in the structure of this iron, so far as those functions alone are concerned, from, say a construction as shown in the second of the patents, where you slide two parts relatively to each other, to get them to interlock, and then have a catch? A. No; of course, they are different in details, that is all.

"Q. That function is identical? A. Yes, sir."

This testimony was given in reference to the Mumby patent before referred to, which shows a detachable handle of a sadiron dovetailed into the base and a spring catch secured to the under side of the handle, and engaging in a depression in the base to hold the handle in place, which we think is on exactly the same principle as appellant's spring device in the patent in suit.

Other prior art constructions are cited by appellant to show that prior art uses and prior art patents anticipate all that is claimed by the patents in suit, but we do not deem it necessary to carry the discussion further on this point. There is nothing in common between the patents in suit and the appellant's construction, which is not also present in the Brown & Sharpe construction, leaving aside the spring catch.

[1] It appears that none of the foregoing prior art was cited in the Patent Office during the prosecution of appellee's patents in suit, and was probably overlooked. We think it was overlooked for the reason that it is apparent to us that the prior art heretofore referred to would have been cited had they been known to the Examiner, for we believe this prior art and prior publication, sale, and use, shown by the evidence, anticipates the patents in suit. It appears to us that the Brown & Sharpe prior use and publication affords a perfect example of the keyhole slot and lug connection claimed in the patents in suit. The issue between the parties seems to resolve itself into the question: Whether the appellee's structure should be regarded merely as a strap brake with a detachable ear, or should be regarded in the larger sense as a new combination of old elements, resulting in a new and useful purpose. It seems to be the idea of the appellee that the novelty of the invention becomes clear, in view of the circumstance that no device of any form embodying the principle of the detachable ear had theretofore been used in connection with an automobile brake band, and that the introductory phrase of each of the claims, namely, "an automobile transmission band," implies such a combination. This phrase we think imports nothing by way of structural elements into any of these claims, nor does it make them other than claims to a strap brake with a detachable ear. These words merely state the environment in which the device is to be used; and, in the language of then Circuit Judge Taft, in Stearns v. Russell (C. C. A.) 85 F. 218, "define the useful purpose to which the patentee intended his device to be devoted."

In the above-cited case, the court had under consideration a claim introduced by the phrase, "in pill-dipping mechanism." In that case an appliance used in a pill-dipping machine was held unpatentable in view of the use of similar devices in button machines, nail machines, and printing presses. Referring to the introductory phrase to the claim in that patent, namely, "in pill-dipping mechanism," Judge Taft said:

"To imply as elements of a claim parts not named therein for the purpose of limiting its scope, so that it may be accorded novelty, is contrary to a well-settled rule of the patent law"—citing McCarty v. Railroad Co., 160 U. S. 110, 116, 16 S. Ct. 240, 40 L. Ed. 358.

He further said, referring to said quoted phrase:

"We think these words are only used to define the useful purpose to which the patentee intended his device to be devoted, and cannot bear the construction by which all the other substances and parts used in dipping pills may be considered as making up the combination claimed."

However, that question does not necessarily arise in the case at bar. The appliance used in the pill-dipping machine case above referred to was held unpatentable in view of the use of similar devices in button machines, nail machines, and printing presses, arts more remote from the pill-dipping machine

than are the arts in which Brown & Sharpe, the Wrede, the Vaughan & Blaney, and the Mumby patents were used.

Appellee simply used an old detachable ear on an old strap brake, in the first patent in suit, and added a spring in the second patent in suit. It is not a question of adapting the Brown & Sharpe "spindle brake" or the old spring device to the use of an automobile transmission. The inventions of the patents in suit have nothing to do with adapting a strap brake to an automobile transmission. The strap brake remains exactly as it was before, and performs precisely as it always has in a Ford transmission.

The subject-matter and the only subject-matter of the claimed inventions in suit must, we think, lay in making an ear readily demountable without affecting the ordinary function of the band. The appellant's improvement is confined to the structural characteristics of the band itself and the demountable ear. And in relation to anticipation we think it cannot make any difference that Brown and Sharpe's "spindle brake" with all of its connections and attachments suitable to its particular environment, cannot be transferred intact to the automobile transmission; and, even if the introductory clause of these claims should be taken as so far indicating a new environment as to suggest a new use, we think it would be nothing more than a double use.

Appellant's construction, so far as it relates to the spring, represents merely an ordinary spring catch or latch, doing just what a device is expected to do wherever employed, to hold something in place. Neither modification nor adaptation was necessary when transferring such a device from one art to another. The spring catch of patent 1,198,-091 is nothing more nor less than the spring catch of Wrede's smoothing iron, serving the same purpose and in exactly the same way, to maintain a keyhole slot and stud connection between the two parts.

Adverting to the claims in the two patents in suit for the purpose of comparing the Brown & Sharpe construction with the White construction, the following are typical of the claims in the first patent in suit:

8. An automobile transmission band, comprising a strip of resilient material and an ear slidably engageable thereon.

9. An automobile transmission band, comprising a strip of resilient material and an ear slidably engageable upon and removable therefrom.

6. An automobile transmission band, comprising a curved strip of resilient material, an ear rigidly secured on one end thereof, and an ear slidably engageable upon and removable from the other end thereof.

5. An automobile transmission band, comprising a strip of resilient material, an ear rigidly mounted on one end thereof, a second ear slidably engageable and removable from the other end thereof, and means for limiting the removal of said second ear in but one direction.

The substance of these claims is contained in the expression: "A strip of resilient material and an ear slidably engageable therewith."

It is obvious that an ear of the appellant's construction is made slidably engageable with the band exactly as Brown & Sharpe's ear was made slidably engageable with the band. It follows that the claim expresses no novelty over Brown & Sharpe, having regard to any possible applicability of the appellant's construction. If construed narrowly having reference to the flanging of the band and the dovetailing of the ear in the specific construction shown in the patent as distinguished from keyhole slot and lug connection, then the claim would have no application to appellant's construction, for the flanging and dovetailing features are not present in the appellant's construction.

Claim 9 is a mere repetition of claim 8 in different language. Claim 6 refers to the "strip of resilient material" as being "curved," and recites the "ear rigidly secured on one end thereof." It is obvious that these things had nothing which materially distinguishes these claims from the others.

The Brown & Sharpe curved bands has an ear riveted to the end opposite that where the removable ear is mounted.

The remaining claim 5 is of similar character, specifying "means for limiting the removal of the said second ear in but one direction." This refers to the lateral projection before referred to, limiting the movement of the ear towards the end of the band.

In appellant's construction, movement of the ear in that direction is limited by the ends of the narrow parts of the keyhole slots in the ear encountering the band studs. This corresponds exactly with the Brown & Sharpe construction, so that manifestly claim 5 gains nothing by the above-quoted recital in so far as concerns inclusion of appellant's construction within its scope. It is plain that there is nothing in common between the first patent in suit and appellant's construction which is not found in the Brown & Sharpe construction.

Comparing Brown & Sharpe's device with White's device in the second patent in suit, we refer to the figures hereinbefore set forth. The appellant's claim 5 is as follows:

"An automobile transmission band, comprising a curved strip of flexible material and a removable ear, having a keyhole slot and lug connection with one end."

The elements of that claim, namely, a curved strip of flexible material and a removable ear having a keyhole slot and lug connection with one end thereof, are present in the Brown & Sharpe construction.

All of these elements are common to the three devices, namely, Brown & Sharpe, appellant's, and White's, and it is clear that the second patent cannot claim anything against appellant on this score as a valid patent, including within its scope appellant's patent in the light of the Brown & Sharpe prior use, publication, and sale.

As to the remaining claims of the second patent in suit, each of which includes the spring catch, as we have heretofore pointed out, that precise expedient is found in the prior art in various forms including the exact form in which the device appears in the patent in suit.

We do not believe that a mere transferring from a screw machine band to an automobile brake band, with slidably detachable ear, involves invention. It remained exactly the same expedient, serving the same purpose, and serving it in the same way.

These claims all relate to the one feature of having the ear slidably engageable with a band; claim 5 of the second patent simply specifying a keyhole slot and lug connection.

We also think the transferring of this spring from one art to the other does not involve any change in function and is simply a double use.

Appellee argues that there was a difference between the Brown & Sharpe structure and the appellant's, in that the brake in the former was not demountable. We think, however, that the record clearly shows to the contrary, and that this brake was demountable and was intended and adapted to be removably mounted upon the machine. This was admitted by appellant's expert, and the record otherwise plainly demonstrates it.

Mr. Kinealy testified as follows:

"Q. You understand, do you not, Mr. Kinealy, that when the brake band of the Brown-Sharpe screw machine is taken off, the tightening screw that connects the two angle plates or ears is to be withdrawn, do you not, and then the ear removed, as I am doing now (indicating), and then the detachment made from the frame, so that the whole thing can be slipped out? A. That is one way of doing it. I rather imagine it could be put in place without disconnecting the ears from one another. Of course, that depends upon the machine.

*, * • • • • •

"Q. So you understand that the purpose of making the ear or angle plate detachable was to enable this brake band to be inserted and removed, notwithstanding a restricted space between the pulley and the bed of the machine, or frame of the machine? A. Yes."

This is also shown by the stipulation between the parties in the record, and the whole evidence clearly demonstrates that this so-called spindle brake was an attachment to the Brown & Sharpe screw machine to go along with it or not as the purchaser might desire. It is equally clear that the only way to apply it to the Brown & Sharpe machine corresponds with the way in which the brake band is applied to the drum of a Ford transmission; namely, by inserting or threading the bare end of the band through the restricted space and working the band around the drum and then applying the slidably engageable ear to the end of the band and making the necessary connection between the ears and with the frame or casing of the machine. The process of removal is of the same character.

The appellee also argues there is a difference between the two structures, in that a Ford band "being adapted normally to loosely rest or float in resiliently extended condition upon the reception drum," whereas the Brown & Sharpe brake was rigidly bolted or otherwise secured to the frame of the stationary screw machine.

We think in respect to this there is no difference structurally or functionally in so far as concerns removability of an angle plate or ear or its being replaced. This particular relationship of band and drum in the Ford transmission was the relationship which had always existed and it was not affected by nor did it affect the slidably engageability or disengageability of the detachable ear and band.

Mr. Kinealy, on cross-examination, testified:

"Oh, you spoke about this riding the bands, as you put it, I believe, in reference to the transmission band riding on the pulley. That is just the same situation with the removable ear as it was when the ears were riveted on, isn't it? The same relationship as it was. A. Yes.

"Q. And, so far as this function is concerned, to which I just referred; that is, the interlocking function is concerned, that will be just the same whether the thing rode on the pulley or did not ride on the pulley, wouldn't it? A. Oh, yes."

It is not a question of substituting the Brown & Sharpe spindle brake for a transmission band in a Ford automobile, nor a question of a Brown & Sharpe spindle brake being interchangeable with a Ford transmission band. The proposition is that, where the expedient of making an ear on one end of the brake "slidably engageable" with that band so as to interlock it and be readily removable had been practiced in one environment, there is no invention in applying precisely the same expedient in another environment, particularly where the occasion for so doing was the same, to wit, a condition of restricted space through which the band could not be inserted with the ear upon it.

[2] The law presumes that White, the inventor here, had knowledge of all existing structures. Possessing such presumed knowledge of Brown & Sharpe's practice, we think White exercised no inventive faculty in applying the same expedient in the same way to serve the same purpose in the transmission of a Ford automobile.

The problem was simply that of providing for the threading of a brake band through restricted space which would not permit of the passage of a band with an ear upon it. The problem was the same in the case of Brown & Sharpe structure and that of the appellee, to wit, making that ear readily detachable, while at the same time, when in place, it would be effectively interlocked with the band.

White made use of the same specific form of interlock, to wit, the keyhole slot and headed stud or lug construction. On this point the Supreme Court said, in Mast, Foos & Co. v. Stover Mfg. Co., 177 U. S. 485, 20 S. Ct. 708, 44 L. Ed. 856:

"There is no doubt the patent laws sometimes fail to do justice to an individual who may, with the light he had before him, have exhibited inventive talent of a high order, and yet be denied a patent by reason of antecedent devices which actually existed, but not to his knowledge, and are only revealed after a careful search in the Patent Office. But the statute (section 4886) is inexorable. It denies the patent, if the device were known or used by others in this country before his invention."

[3] The rule of the patent law applicable to the situation here is stated in Mallon v. Gregg & Company (C. C. A.) 137 F. 68:

"The application of an old device to a new use is not in itself an invention or capable of protection by a patent. * * * It is only when the new use is so recondite and remote from that to which the old device has been applied, or for which it was conceived, that its application to the new use would not occur to the mind of the ordinary mechanic, skilled in the art, seeking to devise means to perform the desired function, with the old machine or combination present before him, that his conception rises to the dignity of invention."

[4] We do not believe there was anything recondite or remote in adopting a slidably detachable ear used on a brake band in a screw machine and applying it to an automobile brake band. Here the identical expedient used in the screw machine was applied to the automobile, with the same kind of brake band used in the screw machine. It operated in the same way, and performed exactly the same function in its new environment.

Appellee compares the White structure with a bifocal lens invention which was before this court in Stead Lens Co. v. Kryptok Co., 214 F. 368, where the opinion of Judge Van Valkenburgh in Kryptok Co. v. Stead Lens Co. (D. C.) 207 F. 85, was adopted. In that case Judge Van Valkenburgh said:

"As described in the patent, this is done by taking a lens of crown glass suitable for far vision purposes, producing in one face thereof a recess of such form as to be adapted to receive and accommodate a smaller near vision lens of flint glass, having an index of refraction different from that of the larger lens, and securing this smaller lens within the recess of the larger by means of balsam or other suitable material, the result being a compound bifocal lens uniform in curvature and integral in structure from edge to edge, the minor lens not being visible to others than the wearer except on very close inspection; a crevice or joint between the elements, with its accompanying disadvantages, being entirely absent."

The invention in that case was so recondite and remote from anything that was known before that it could be said to have sprung, as stated in Hollister v. Benedict Mfg. Co., 113 U. S. 59–72, 5 S. Ct. 717, 724 (28 L. Ed. 90), "from that intuitive faculty of the mind put forth in the search for new results, or new methods, creating what had not before existed, or bringing to light what lay hidden from vision."

The principle of law here involved was

stated by the present Chief Justice Taft, when he was upon the Circuit Court of Appeals bench, in the case of Stearns v. Russell, 85 F. 218, 226:

"The remaining question is, Did it require the inventive faculty to conceive the use of the Cox carrier for pill-dipping, and to apply it to that art? It has long been settled that a mere use or function is not the subject of a patent, and also that 'the inventor of a machine is entitled to the benefit of all the uses to which it can be put, no matter whether he conceived the idea of the use or not.' Roberts v. Ryer, 91 U. S. 150, 157 [23 L. Ed. 267]; Goshen Sweeper Co. v. Bissell Carpet Sweeper Co., 37 U. S. App. 555, 19 C. C. A. 13; and 72 F. 67, and cases there cited. It would seem to follow as a corollary to these two propositions that, where it requires substantially no change in the old device to adapt it to the new use, such adaptation cannot be the subject of a patent, no matter how remote and unthought of the new use may be, provided no new force or mode of application be necessary in carrying on such use; otherwise, in case the device has been patented, the right of monopoly of the prior patentee is invaded by excluding him from a use of a machine which, by the rule stated and the authorities cited above, he is entitled exclusively to enjoy. If, however, the adaptation of the old machine to the new use involves a change in its form or operation, it may, by the changes and very newness of the use or function, become either a new machine or an improvement on the old machine, and be patentable as such; or the new use of the old machine may result in a new product, which is itself patentable; or the use may be a step in a new and patentable process. The general rule, however, is stated by Mr. Justice Gray, in delivering the judgment of the Supreme Court, in Pennsylvania R. Co. v. Locomotive Engine Safety Truck Co., 110 U. S. 490, 494, 4 S. Ct. 220 [28 L. Ed. 222], as follows:

" 'It is settled by many decisions of this court, which it is unnecessary to quote from or refer to in detail, that the application of an old process or machine to a similar or analogous subject, with no change in the manner of application, and no result substantially distinct in its nature, will not sustain a patent, even if the new form of result has not before been contemplated.'

"Tested by this rule, we cannot think that the device of the complainant was patentable. * * * It is quite possible that the conception of the machine by the complainant was a real exercise of the inventive faculty on his part, because he did not know of the Cox or Comly devices, or of the Campbell and Walsh patents; but, in judicially estimating the amount of invention in a patented device, the court is bound to assume that the history of prior patents and machines, having a bearing on the subject-matter, was known to the patentee."

We think, that with the devices in the prior art heretofore referred to before him, a competent mechanic, upon the mere suggestion of the purpose which it was desirable to effect, would have readily applied the old devices to the Ford automobile brake band.

In Thatcher Heating Co. v. Burtis, 121 U. S. 286, 7 S. Ct. 1034, 30 L. Ed. 942, the court said:

"It is admitted that what Thatcher did, and all that he did, was to transfer this well-known fuel magazine from its use in an outstanding base-burning stove to a fireplace heater, equally well known and in common use as to its arrangement, construction, position, and mode of operation. When this fuel magazine was thus transferred from one kind of stove to another, in its new situation it performed precisely the same function, with respect to the fuel and the fire, as it had always been accustomed to perform in its old place, and the fireplace heater into which it was thus newly placed, so far as the generation and transmission of heat and heated air are concerned, operated precisely as it had habitually done before."

Our conclusion is that the patents in suit are clearly devoid of any patentable novelty whatever, and that the claims in suit are completely anticipated by the prior art hereinbefore referred to; that any narrowing interpretation of any of these claims, which could in any way distinguish them from the prior art, would necessarily make them inapplicable to appellant's construction.

The decree is reversed, with directions to dismiss the bill for want of equity.