## COLLINS et al. v. EMERSON.
### No. 3699.

District Court, D. Massachusetts.
April 29, 1935.

Hale & Dorr and Grafton L. Wilson, all of Boston, Mass., and Hammond & Littell and Nelson Littell, all of New York City, for plaintiffs.

Robert L. Thompson and Roberts, Cushman & Woodberry, and Robert Cushman, all of Boston, Mass., for defendant.

McLELLAN, District Judge.

The plaintiffs, Warren E. Collins, Warren E. Collins, Jr., and Walter G. Chick, as individuals and as trustees, and Warren E. Collins, Inc., bring this suit for alleged patent infringement against the defendant, John H. Emerson.

Statements of fact herein are intended as findings of fact, and statements of legal conclusions as rulings of law, under the equity rules.

The individual plaintiffs, as trustees, hold the legal title to the patents, and the corporate plaintiff, a manufacturer of hospital equipment in Boston, is the sole licensee thereunder. The defendant maintains a machine shop in Cambridge for the manufacture of hospital and research equipment, and began the manufacture of respirators in the summer or fall of 1931.

The three patents in suit, numbered 1,834,580, 1,906,453, and 1,906,844, will be referred to respectively as the first, second, and third patents. All the patents relate to the construction of an apparatus for producing prolonged artificial respiration in human beings. The respirators purporting to have been manufactured under the patents have been known as the "Drinker" respirators and have been used chiefly for victims of infantile paralysis whose lung muscles were affected. Such respirators are useful also in administering artificial respiration wherever, as in the case of gas poisoning, electric shock, drowning, and asphyxia of newborn babies, such artificial respiration is needful or desirable. The Drinker respirators, so called, concededly work admirably, and without considering the contents of the file wrapper, which are inadmissible for such purpose, I find that in 1929 and thereafter there was a considerable demand for Drinker respirators for use in hospitals. These respirators are described in detail hereafter when the patents are discussed.

The defendant's respirators were first made after the defendant had seen the plaintiffs' product, and in many respects closely resemble it. The defendant's apparatus consists of a hollow casing having a bed slidable into the casing through the open end, a removable wall section or cover connected to the bed, a flexible rubber collar made of a sheet of sponge rubber fastened over a hole in the removable wall section, and an adjustable headrest. The interior of the casing is provided with an electric light and a pressure gauge is connected with the interior of the casing. Alternate variations of pressure within the casing are obtained by a diaphragm or bellows located on the closed end of the casing, which may be operated either electrically or by hand. The amount of pressure within the casing is controlled by a leak or escape valve in the side of the casing. A flap valve in the casing prevents positive pressure above atmospheric pressure, but if a pressure higher than

atmospheric is desired, this valve may be locked. The respirators have air-tight ports or openings in the side through which an attendant may insert his hands without interrupting the operation of the device.

### The First Patent in Suit—No. 1,834,580.

The application for the first patent, made by Philip Drinker and Louis Agassiz Shaw, assignors to the Consolidated Gas Company of New York, was filed July 23, 1929, and the patent was issued December 1, 1931. It is stated that the primary object of the invention is to provide an apparatus which will simulate natural breathing in the patient, both as to the periods of exhalation and inhalation and as to the quantity of air drawn into the lungs of the patient, thus resulting in artificial breathing which will be regular and rhythmic. A further stated object of the invention is to provide an apparatus in which the patient will be at his ease during the treatment and in which he can breathe naturally, if so inclined, or in which he may be assisted to any desired extent by the apparatus. "It is a further object to provide an apparatus of this character in which the patient can talk, eat and sleep without discomfort and without discontinuing the treatments."

Annexed hereto and made a part hereof is a copy of the drawing accompanying the application for the first patent in suit: Ac-

cording to the specification, Figure 1 is a side elevational view and Figure 2 a front elevational view of the respirator; Figure 3 is a slightly enlarged plan view of the pressure producing apparatus and alternator; Figure 4 a detailed view of the reduction gears employed for varying the period of the pressure change; Figure 5 a detailed view of one of the exhaust valves; Figure 6 a sectional view on the line 6–6 of Figure 5; and Figure 7 a detailed view of the valve mechanism of the alternator.

The specifications proceed:

"Referring to the details of the drawings, there is provided a relatively strong, air-tight casing 10 of any preferred shape which is constructed of sufficient length, height and breadth to accommodate the body of a large man or woman. The casing 10 is supported upon any suitable standard, as indicated for example at 12, whereby the casing is placed at a convenient height for use. One wall of the casing, preferably the front wall 14, is removable to provide access to the interior thereof. As at present constructed, the front wall 14 has an additional support 16 facilitating the movement of the wall 14 toward or away from the casing 10.

"A body support 18, shown as a mattress and its supporting frame, is mounted for movement into or out of the casing 10. Rollers 19 and a cooperating track 20 on the floor of the casing serve to support the

body rest 18 within the casing and to permit the withdrawal of the body support from the casing when desired. The body support 18 is rigidly attached to the end wall 14 whereby it may be partially supported by the supports 16 for the end wall 14.

"The end wall 14 is provided with an opening 22 which receives a flexible sealing member 24 formed of relatively strong, flexible rubber. The sealing member 24 has a central opening 25 adapted to fit snugly around the neck of the patient. The head of the patient may be passed through the opening 22 due to the resiliency of the material of the sealing member 24. The member 24 is removably attached within the opening 22 and is sealed at its outside edge against the admission of outside air by means of the securing bolts shown. Several different sizes of collars or sealing members 24 may be provided and the one best suited to the size of the patient selected.

"The head of the patient is allowed to rest upon a support 26 positioned just outside of the opening 22 and adjustable vertically to accommodate the particular patient being treated. Any suitable adjustment means may be used for the support 26.

"The casing 10 is provided with various accessories to modify the condition within the same and to indicate such conditions. To this end, the casing is provided with one or more openings 28 closed by means of transparent closures so that the interior of the casing may be inspected. The closure for the opening 28 is preferably of thin aluminum or glass composition, so that X-ray or ordinary pictures may be taken of the patient without removing the body from the casing. A thermometer 30 indicates at all times the temperature within the casing. This temperature is normally maintained at substantially room temperature by the airflow to and from the casing as described below. The temperature may be raised at any time by means of an electric light 32 mounted in the casing, or lowered by passing the air through a suitable cooling medium.

"The degree of pressure or partial vacuum within the casing is indicated at all times by means of an open manometer 24 one leg of which is connected to the casing 10 by means of a tubular conductor 36, the other leg being exposed to the outside air. The manometer is provided with a suitable chart to indicate the degree of suction or pressure then present. The manometer 34 thus serves as an indicator of the pressure conditions within the casing. The mano-meter also serves as a pressure or suction relief valve in that any excessive pressure or suction blows or draws the fluid out of the open manometer and thus relieves the excessive pressure or suction condition within the casing.

"The mechanism for providing alternate suction and pressure conditions within the casing 10 may be constructed in various manners. In the present embodiment, we have shown a preferred construction wherein a plurality of centrifugal air compressors 38 and 39 are connected in series relation to the suction tube 40 and pressure tube 42. This construction is preferred in that it provides a substantial air flow and sufficient pressure for the proper operation of the apparatus at all times. The tubes 40 and 42 are formed with vents 43 and 44 which are normally closed, but which permit either the suction or pressure portion of the apparatus to be rendered ineffective. The rotary closures 45 may be readily adjusted to open or close the tubes 40 or 42 with respect to the outside air. The tubes 40 and 42 pass through the valve mechanism or alternator 46 and may thence pass to a Y-joint 48, the latter being connected by a relatively large tube 50 with the interior of the casing.

"The alternator 46 includes a rotary valve member 52 mounted for rotation with a shaft 54 and formed with a transverse opening 56 and a cut-away portion 57. The openings 56 and 57 are constructed to be placed alternately in the path of the tubes 40 and 42 so as to cause one of these tubes to communicate with the tubular member 50 and the other member to be exposed to the outside air through the cut-away portion 57. On rotation of the valve member 52 about a half circle the other tube (42 or 40) will then be placed in communication with the tubular member 52 and the opposed member (40 or 42) placed in communication with the outside air.

"Rotation of the valve shaft 54 is accomplished by means of a timing motor 58 and a set of reduction gearing indicated generally at 60. This gearing includes three stages or sets of gears which have been found sufficient for our purposes. The gears 61, 62, and 63 are mounted rigidly on a shiftable shaft 64 having a squared portion to cause the same to be rotated with the gear 65 driven from the motor 58. The driven shaft 54 carries three cooperating gears, 66, 67, and 68 which may be enmeshed with any of the shiftable gears 61, 62, or 63 respectively. When the gears 61 and 66 are in mesh,

the shaft 54 is driven at a relatively slow speed. This provides the minimum number of alternations of pressure conditions, for example 12 to 16 changes per minute. This is the adjustment normally used for adults. When the gears 63 and 68 are enmeshed the shaft 54 is driven at an intermediate speed and provides approximately 20 to 24 alternations of the pressure condition per minute. This is the adjustment employed for small children up to six or eight years of age. When the gears 62 and 67 are enmeshed the shaft 54 is rotated more rapidly providing alternations in the pressure changes at a relatively higher rate of from 45 to 60 pressure changes per minute. This adjustment is used for the treatment of very small children, for example, premature and still-born babies.

"While the pressure and suction pumps 38 and 39 provide greater degrees of pressure and partial vacuum than required for the normal use of the apparatus, their effect may be varied to any extent by means of the adjustment valve 70. This valve is manually adjustable to permit only a sufficient amount of air to pass the same to increase or decrease the pressure within the casing to the extent desired. It will be evident that if the valve 70 is adjusted to provide a relatively small opening permitting the passage of air therethrough, the pressure or partial vacuum condition within the casing 10 will reach a much lower extent than where the valve 70 is wide open and the entire force of the compressors is directly admitted into the interior of the casing. The usual degree of vacuum or pressure required for producing artificial breathing in the average patient is about 5 to 15 centimeters of water, although 30 centimeters of water or more may be required to cause the subject to fall into rhythm with the pump.

"Suitable switches indicated generally at 72 supply electric current to the timing motor 58 and to the motors of the compressors 38 and 39.

"In the operation of the above apparatus, the clamps 15 are unfastened and the end wall 14 and body support 18 are moved outwardly from the casing 10 into position to receive the body of the patient. The head of the patient is passed through the opening 22, the flexible sealing member of which is enlarged to permit the passage of the head of the patient therethrough. The flexible member then contracts into engagement with the neck of the patient and provides a seal at this point against the outside air.

The adjustable head rest 26 (is) adjusted to suit the patient and the end wall 14 is then moved inwardly toward the casing and the clamps 15 tightened to seal the wall 14 against the casing 10. The body of the patient is thus entirely within and subjected to the pressure conditions within the casing, yet the head of the patient is exposed for observation or treatment and the patient is entirely at ease. The shaft 64 is shifted to cause the proper gears to enmesh as described above for the patient then being treated. The switch 72 is then actuated to start the timing motor and compressors. The valve 70 is adjusted while observing the manometer 34 to provide the proper extent of the pressure variations within the casing. Thereafter the patient is observed and if a higher temperature is necessary within the casing, the light 32 is lighted and the temperature correspondingly increased. The body of the patient may be observed within the casing through the opening 28. The patient may be given food or medicine, and can sleep or talk without interrupting the treatment.

"If at any time it appears that the patient is breathing normally and of his own power the valve 70 may be entirely closed and the apparatus used as a plethysmograph. Any natural breathing of the patient may thus be observed in the manometer without disturbing the patient or the apparatus in any other manner. If it appears that the patient is not breathing naturally, the valve 70 may be opened again and the artificial respiration resumed.

"It will be evident that many variations may be made in the apparatus within the principles of the invention as stated above, the shape and size of the casing may be varied and any desired mechanism used to effect the pressure changes therein without departing from the spirit of our invention or the scope of the accompanying claims."

The plaintiffs say they rely on claims 1, 2, 3, 6, 7, 8, 9, 10, and 11, but that for the purposes of this suit, claims 6 and 8 are sufficiently illustrative. These claims read:

"6. A respirator apparatus for artificially producing respiration comprising a hollow casing having an open end, a patient receiving carriage slidable into and out of said casing, a closure connected to said carriage and adapted to seal said casing, said closure having a central aperture through which the patient's head may be projected and a collar to closely encompass the neck of the patient, said carriage adapted to receive a patient

and to be slid into said casing with the head of said patient extending outside of said casing, said collar acting as a pressure seal whereby the body of said patient within said casing may be at a pressure different from the atmospheric pressure around the head of said patient, and means to periodically vary the pressure within said casing from a negative pressure to atmospheric pressure or above."

"8. In an apparatus for producing artificial respiration, a hollow casing for receiving the body of a patient, a body support slidable to and from the interior of said casing, said casing having a removable wall section through which the head of the patient is adapted to project, means for forming an air-tight seal around the neck of the patient and means for forming an air-tight seal between the section and the body of the casing, and means for producing alternate variations of pressure within said casing."

In his brief, counsel for the plaintiffs underlines that portion of claim 6 reading, "*a patient receiving carriage slidable into and out of said casing, a closure connected to said carriage and adapted to seal said casing * * *,*" and, referring to claim 6, then says: "The invention is similarly described in the other claims relied upon, and while it includes the complete operative structure of a respirator, including a casing adapted to receive a patient with his head projecting therefrom, and means to produce variations of pressure within the casing to induce artificial respiration, *the feature of novelty and importance is that of having the bed portion connected to the head portion so that the head and bed portion may be slid toward and away from the casing as a unit.*" (Italics added.) In view of this assertion as to what constitutes the feature of novelty and importance and the concessions involved therein, it may seem unnecessary to go into the following details as to the claims involved in the first patent.

Omitting claim 7, which as hereinafter shown is not infringed, the claims in suit contained in the first patent, as pointed out by the defendant's counsel, in varying forms of words specify the following features:

1. The casing to receive the body of the patient;

2. The sliding bed to move the patient in and out of the casing;

3. The removable wall section or closure for the open end of the casing, with a hole for the head;

4. Connecting the closure to the sliding bed;

5. The flexible, sheet rubber collar to form a seal around the neck of the patient;

6. The sealing of the closure to the body of the casing;

7. The adjustable headrest; and

8. The means to vary the pressure in the casing.

Not all of these elements are contained in any one claim, but some of them are combined in each of the claims.

As affecting the presumption of validity which often arises from the issuance of the patent, it is noteworthy that with the exception of the Boyle patent, most of the prior art publications and patents to which reference is about to be made were not cited or considered by the Patent Office. International Flatstub Check Book Company, Inc. v. Young & Selden Co. of Baltimore City (C. C. A.) 284 F. 831.

The Woillez publication, 1876 (Exhibit 19), was not so cited or considered. The sketch (Exhibit 23) purporting to illustrate the respirator which Woillez describes constitutes a reasonably accurate illustration of the apparatus. As stated in the defendant's brief, the only detail in the Woillez description which conceivably is not sufficiently explicit is the description of the collar for preventing the passage of air. Woillez says, "A flexible, impermeable fabric attached to the diaphragm is secured around the neck." The most obvious fabric for this purpose is sheet rubber, and if in spite of this it be thought that something is lacking in Woillez' description, it is supplied by Dr. Knapp, who described the Woillez collar as *"rubber material attached around the neck."* (See Knapp publication, 1904, in Exhibit 19.)

The only evidence tending to show that the respirator described by Woillez was ever used is contained in the Knapp publication, and I am unable to find that it received any substantial commercial use. But the statute (35 USCA § 31) makes a prior publication more than two years old the equivalent of a prior use as an anticipation.

Some of the most important portions of the text of the Woillez publication, describing the construction and operation of the respirator, which he called a "spirophore," (taken from Exhibit 19) follow:

Pages 613, 614:

"The new life-saving apparatus which I am about to take up with you, has been designed on the same principle.

"This apparatus consists of a zinc or sheet iron cylinder large enough to receive the body of an adult up to the neck. It is equipped with wheels, which permit moving it rapidly to the place where it is necessary. This cylinder set almost horizontal, slightly inclined, is hermetically closed at the foot end and open at the head end. Through this opening at the head end, you slide in the body of the patient by means of a sort of stretcher equipped with rollers, on which he is previously placed; then you close the head opening around his neck by means of a diaphragm that you attach to the edges of the opening. The head thus remaining free rests on an appropriate support. A flexible, impermeable fabric, attached to the cover diaphragm, is secured around the neck or head (from chin to sinciput) to avoid as far as possible the passage of exterior air to the inside of the apparatus, at the moment when the vacuum is produced there.

"The air thus confined in the apparatus around the body of the patient can be partially rapidly withdrawn by means of a powerful aspirator bellows of about 20 litres capacity, situated outside the principal cylinder and actuated by means of a lever. The interior of this pump communicates with the interior of the apparatus through a large tube tightly screwed on.

"Finally, to facilitate experiments, a translucent glass has been placed at the head end of the machine, to allow observation of the functioning of the chest during experimentation; and on top there has been placed a glass tube connecting merely with the inside of the chamber, and in which one can follow the movements of a free rod which should rest perpendicularly on the breastbone of the patient.

"Just as, in the spiroscope, you were able to see a lung expand when the vacuum was produced inside the tube of fine glass, so the entire chest expands when a corresponding vacuum is created in the cylinder of the new apparatus. The experiments the results of which I am going to show will demonstrate to you very clearly with what ease artificial respiration is produced in such cases and how the respiratory movements take place."

Page 618:

"These are the experiences that I have the honor to submit to you. They give evidence, in my opinion, of the assistance that this apparatus can render in asphyxia in general. The important result of its operation is forcing into the lungs rapidly and easily and as frequently as natural respiration does, a greater quantity of air than the physiological method does. All experimentors agree on this point, that establishing normal respiration in a healthy man requires the penetration of half a litre of air into his chest. But the spirophore made more than half a litre of it penetrate instantaneously, so to speak, at each artificial respiratory movement, into lungs without elasticity, stuck to the ribs, and completely infiltrated with tubercles. It made almost a litre of it penetrate at each breath into the greatly congested lungs of the body of a young woman.

"These results seem to me conclusive. If I add that artificial respiration thus produced is analogous to physiological respiration, since it takes place following the raising of the ribs and sternum and the simultaneous lowering of the diaphragm, I believe there will remain no doubt as to the utility of the apparatus for remedying asphyxia.

"Its use, besides, embodies no inconvenience. One might think, as has been said to me, that aspiration on the whole body might act on the capillary circulation like a powerful cupping glass; but the case is entirely different. Removing air from the chamber of the spirophore, in evacuating it, causes, in the pulmonary cavities, only the pressure of the external air acting in response to atmospheric pressure, and this penetration occurs to put in balance the lowered pressure in the inside of the chamber; consequently, it cannot having a sucking action on the body capillaries."

Page 622:

"*Asphyxia of new-borns.* The spirophore for adults is much too large to use for new-borns; an apparatus of small dimensions is sufficient for treating their asphyxia, and all that is necessary to make them breathe in is a cylindrical pump, fitted to the box and like that of the spiroscope."

Thus, it appears that with a single exception every important feature in the claims in suit contained in the first patent is to be found in the respirator described by Woillez. The exception is that Woillez shows no direct connection of the end cover to the sliding bed. In other words, Woillez does not show "the bed portion connected to the head portion so that the head and

bed portions may be slid towards and away from the casing as a unit," which, as hereinbefore stated, counsel for the plaintiffs contends is the feature of novelty and importance. In Woillez, the removable cover is not directly connected to the bed, although it is carried by the bed and moves therewith to and from the casing. Under the circumstances, it might well be doubted whether affixing the cover permanently to the bed involves more than a mechanical detail or results in a patentable invention, even if the Boyle patent, No. 592,234 (Exhibit 19), were disregarded.

In 1897 Boyle described an apparatus for administering shower baths or vapor baths. It had a casing or cabinet to receive the body of the patient with the head exposed, and a sliding bed or carriage for moving the patient in and out of the cabinet through the opening in the end. A cover or wall closure for the open end of the casing was *attached to the head of the sliding bed* and moved with the bed. (Italics added.) The head and neck of the patient extended through a hole in the cover and the cover (cloth or other pliable material) was closely fastened around the neck. The Boyle patent (Exhibit 19) states:

"The operation of the device is as follows:

"The person to be bathed lies outstretched on the carriage-body 4 with the head protruding through the aperture 3' in the end 3. * * * The carriage is then pushed into the cabinet * * *."

The Patent Office cited the Boyle patent and at first rejected the claims of the first patent in suit addressed to the sliding bed and the "connected" cover. It later came to a different conclusion.

If there is any merit in the contention that the Boyle patent did not constitute a good reference because the Boyle device was a bath cabinet and not a respirator, this would not lead me to think that, if the Examiner had known that Woillez had already applied the sliding bed to a respirator, he would have receded from his original position rejecting the claims. In order to constitute anticipation, it is not necessary that all the elements of an alleged invention be found in a single publication or a single patent. Huebner-Toledo Breweries Company v. Mathews Gravity Carrier Company, 253 F. 435 (C. C. A. 6).

No different problem is involved in affixing a bed to a closure in the case of a res-pirator than in the case of a bath cabinet. In each of the two therapeutic devices the problem of mounting the end closure on the carriage is the same. What is done to the patient after he is in the apparatus is a matter of indifference to the mechanics of conveniently getting him into and out of the apparatus. The Boyle patent may not be cast aside as belonging to an unrelated art. Paramount Publix Corporation v. American Tri-Ergon Corporation (U. S.) 55 S. Ct. 449, 79 L. Ed. ——, decided March 4, 1935; Royer v. Roth, 132 U. S. 201, 10 S. Ct. 58, 33 L. Ed. 322; Stearns & Co. v. Russell (C. C. A.) 85 F. 218, in which the opinion was written by Chief Justice Taft.

Besides the Woillez respirator and the Boyle bath cabinet, Defendant's Exhibit 19 discloses other prior art sliding beds embodied in therapeutic cabinets in each of which the body of the patient is slid into the casing only up to his neck, while his head remains outside during treatment. Keech (1877); Kellogg (1896); Wolpers (1905); Giedinghagen (1915); Frink (1917).

A collar consisting of flexible rubber sheet appears in Breuillard (1887); Sauerbruch (1904); Schwake (1926); all in Defendant's Exhibit 19, and Haldane and Priestley (1905) in Plaintiffs' Exhibit L. The Binger and Davis Plesythmograph (Exhibit 6) is also provided with a rubber collar (Exhibit 15) made of flexible rubber sheet.

Adjustable headrests have been in common use in dentist chairs and barber chairs for many years. Such headrests are disclosed also in the Binger and Davis plesythmograph (November 1, 1927—Exhibit 6); the Boyle bath cabinet (Exhibit 19); and Sauerbruch's vacuum apparatus for chest surgery (Exhibit 19).

The so-called double seal feature, the first seal being that between the collar and the neck of the patient and the second that between the end of the diaphragm and the end of the casing accomplished by the drawstring, are illustrated in the Woillez respirator. See, also, the Breuillard respirator (1887) and the Boyle bath cabinet (1897) in Defendant's Exhibit 19.

The claims in suit refer to means for producing alternate variations of pressure. Unless the claims for "means" are to be limited to the means described in the specification as preferred, no novelty is involved, because the production of alternate varia-

tions of pressure in a respirator is old. If in spite of the statement in the plaintiffs' brief (page 43) that "The claims of the patents are not limited to any specific pumping mechanism for producing alternate variations in pressure," these claims are to be thus limited to two pumps, one for vacuum and one for positive pressure, and the rotating "distributor" valve for putting the two pumps alternately in connection with the casing, no infringement has been shown because the defendant uses a simple bellows, like Woillez' (Exhibit 19) and Severy's (Exhibit 20).

Though the apparatus produced by the plaintiffs is of great practical utility, serves a great public need, works admirably, and is entitled to widespread use, I am constrained to find that in view of the state of the prior art, the first patent, so far as the claims in suit numbered 1, 2, 3, 6, 8, 9, 10, and 11 are concerned, is invalid for want of invention, unless construed as limited to the preferred pumping means, and that if so limited these claims are not infringed.

■ In addition to certain elements contained in the other claims, claim 7 calls for "means to control the temperature within said casing, including a warming means, a cooling means, and a ventilating means, said housing having gauges whereby said internal conditions may be known." The gauges shown in Figure 1 are the thermometer 30 and the manometer 34. The defendant's apparatus contains a manometer but no thermometer. The cooling means described in the plaintiff's patent consists of "passing the air through a suitable cooling medium" while the defendant's machines provide for no cooling medium through which the air may pass. The defendant's product omits some of the elements of the seventh claim and does not constitute an infringement thereof. Sargent v. Hall Safe & Lock Co. et al., 114 U. S. 63, 5 S. Ct. 1021, 29 L. Ed. 67.

The Second Patent in Suit—No. 1,906,453.

■ The application for the second patent, made by Philip Drinker and Louis Agassiz Shaw, assignors by mesne assignments to Warren E. Collins, Warren E. Collins, Jr., and Walter G. Chick, was filed November 25, 1931, and the patent issued May 2, 1933.

The respirator described is designed particularly for treating newborn infants and very small children, although certain features of the apparatus are applicable likewise to the adult forms of respirator hereinbefore described. This infant respirator, so called, consists chiefly of a casing having a hole in one wall through which the head projects, an opening on top through which the patient is inserted, a door to close and seal the opening, and a pumping device for varying the pressures of air. The claims relate to the application to a respirator of a rubber collar to fit around the patient's neck and a clamp to hold the collar in adjusted position.

In his brief, counsel for the plaintiffs states that although they rely on claims 1, 3, 4, 5, and 7, it is believed that for the purposes of this suit claims 4 and 5 are sufficiently illustrative. These claims read:

"4. In an apparatus for producing artificial respiration, a casing to receive the body of the patient, an opening in one wall thereof through which the head of the patient projects, means to produce periodic variations in pressure within said casing and means to provide a seal for said opening comprising a stretchable rubber collar adapted to fit around the patient's neck and be clamped to the wall of said casing, and clamp means at a plurality of points around the opening in said casing wall to clamp said collar in adjusted and stretched position.

"5. In an apparatus for producing artificial respiration, a casing to receive the body of the patient, having an opening in one wall thereof through which the head of the patient projects, means to periodically vary the pressure in said casing, and means to provide a seal around the patient's neck comprising a sheet of rubber material having an opening therein and means to clamp said sheet to the casing wall through which the patient's head projects, said clamping means permitting bodily adjustment of the position of said collar and also permitting portions of said collar to be stretched and moved relative to other portions of said collar, and permitting said portions to be clamped in said stretched positions."

As stated in the plaintiffs' brief, the second patent, while illustrating an infant size respirator, relates to the collar construction, the principles of which are used on both the adult and infant respirators. The collar may be clamped by means of the construction illustrated in the second patent at one or more of a plurality of points and left sufficiently loose at any of the other points so that it may be stretched and adjusted both with reference to the position of the patient's neck and with reference to the

pressure with which the inner edge of the collar bears upon the patient's neck. The four-clamp arrangement shown in Figure 4 of the patent permits an attendant to release and readjust the collar at any point without the necessity for releasing the collar at all points, and thereby permits a more ready adjustment than was the case in the first patent in suit or in the Drinker and Shaw publication contained in Defendant's Exhibit 19.

This clamp arrangement for making the collar adjustment is contained in the defendant's infant respirator (Plaintiffs' Exhibit F) and was originally used in the defendant's adult respirator, as illustrated in the stipulation (Plaintiffs' Exhibit D).

In the first patent, the applicants feature in claim 10 "a flexible rubber sheet with an opening for the patient's neck, said sheet being arranged to form an air-tight seal around the neck of the patient while permitting movement of the head and neck, means for clamping the outer edges of said rubber sheet to form an air-tight seal with the wall of the casing, a head rest outside of said casing," etc. See, also, claim 11. Moreover, the Drinker and Shaw article of 1929 (Exhibit 19), disclosing such a respirator with a rubber collar, was published more than two years before the application for the second patent.

Unless novelty may be found in the clamping means referred to in the patent, none exists.

The specification describes the clamping means in substance as follows: The collar is made in the form of a thin flexible sheet which can be drawn taut and held in position by means of a ring and four clamps. The clamps may be of any suitable form. As shown, they are supported on headed pins, about which they pivot, and they are tightened by means of thrust screws. When the collar is applied about the neck of the patient, it is stretched radially until it fits comfortably but tightly, and then it is clamped by the ring and clamps in the desired position. By the use of four clamps operating on the ring, it is possible to adjust the clamps to hold about three-fourths of the diameter of the collar while still permitting adjustment of the other one-fourth. The rubber collar is made large enough so that it can be clamped in eccentric position relative to the aperture in the end wall.

The Binger and Davis plethysmograph (1927) (Exhibit 6), had a sheet rubber collar which was adjustable by means of a ring made in two parts with a lock to draw the two ends together, bind the ring against the collar, and press the collar tightly against a flange on the casing wall. By partly loosening the lock of the clamp any part of the collar could be released enough to permit stretching, while the remainder of the collar was held secure by the clamp. By wholly loosening the clamp, the collar as a whole could be adjusted.

The Haldane and Priestley plethysmograph (1905) (Exhibit L), had a rubber collar with a broad flange which was pressed down tightly on a layer of plasticine on the lid of the box by a ring of wood. The ring was in two pieces and was pressed down on the collar by means of thumb screws, forming an airtight connection between the neck of the patient and the box.

In view of the state of the prior art, the claims in suit of the second patent, numbered 1, 3, 4, 5, and 7, are invalid for want of invention.

The Third Patent in Suit—No. 1,906,844.

The application for the third patent in suit, made by Philip Drinker and Louis Agassiz Shaw, assignors by mesne assignments to Warren E. Collins, Warren E. Collins, Jr., and Walter G. Chick, was filed November 27, 1931, and the patent issued May 2, 1933.

The alleged invention of the third patent relates to the use of so-called portholes equipped with rubber diaphragm members to make a seal around the attendant's arm when inserted in the respirator, and permits manipulation of the patient. Thus the patient may be bathed, massaged, have his position changed and be otherwise handled without the necessity for any cessation of the operation of the respirator.

The plaintiffs rely on claims numbered 1, 2, 4, 6, 7, 8, 9, 10, 13, 14, and 15, but their counsel states in his brief that claims 2 and 4 are sufficiently illustrative. These claims read:

"2. An apparatus for producing artificial respiration, comprising a substantially air-tight casing to receive the body of a patient with his head projecting out of said casing, means for periodically varying the pressure within the casing, and means permitting access of an operator's hands for manipulation within the casing, comprising a plurality of ports having apertures adapted to receive the arms of the operator, means in said apertures for forming an air-tight seal

around the operator's arms when inserted therein, and means to seal said apertures in the plane of the casing wall when the operator's arms are not inserted therein."

"4. An apparatus for producing artificial respiration, comprising a substantially air-tight casing to receive the body of a patient with his head projecting out of said casing, means for periodically varying the pressure within the casing, and means permitting access of an operator's hand for manipulation within the casing comprising an arm port, sealing means within said port adapted to form a substantially air-tight seal around the arm of an operator when inserted therein, a second port adapted to permit the insertion of a bedpan or other article into the casing, said port being so positioned relative to the arm port as to permit the operator to grasp in his hand an article introduced through the second port, a cover closing said second port to form an air-tight seal and means to seal said arm port when the operator's arm is withdrawn."

The specification describes the construction of these parts in substance as follows: The casing is provided with a number of arm ports to permit access to the interior for attention to the patient. Each arm port is closed by means of a rubber collar having a central aperture and is designed to form an air-tight seal about the arm of the operator. The position of these arm ports will be arranged as the convenience of the operator and the patient may require. A second rubber disc formed to provide a flap is positioned against the outer face of the rubber sealing collar, and in practice will form an air-tight seal effective if positive pressure is not used. A hinged rigid cover preferably having a transparent window may also be added to afford a locked closure. Conveniently adjacent to the arm ports is placed a larger port or ports of a size to permit the inserting of a bedpan, urinal, or other apparatus. This port is closed by a suitable hinged door packed to provide an air-tight seal. The door can be opened when the vacuum in the casing is released to permit exhalation, an article inserted and the door quickly closed without material interference with the breathing of the patient. At the top of the casing a suitable fitting permits the introduction of a rubber tube for use in giving an enema or for any other desired purpose.

The defendant's respirators do not contain the large port for the insertion of a bedpan or the like, nor do they contain the opening for the insertion of an enema tube or the like. Accordingly, they do not infringe such claims of the third patent in suit as describe these features (claims 4, 6, and 8).

With regard to the arm ports set forth in the remaining claims relied upon by the plaintiffs, the prior art showed, among others, the following devices:

The Binger and Davis plethysmograph (1927) (Exhibit 6) had an arm porthole in one side of the casing fitted with a rubber collar having a hole in the middle. This was closed by a removable cover when not in use. The port was used principally for the patient to extend his arm outside the casing for the purpose of having his pulse taken, etc., but could also be used to insert the arm of the attendant to the inside of the casing.

The Sauerbruch publication (Exhibit 19) discloses a plurality of (two) arm ports fitted with rubber collars.

The Drinker and Shaw article of June, 1929, discloses a plurality of (two) arm portholes.

In view of the prior art, claims 1, 2, 7, 9, 10, 13, 14, and 15 of the third patent in suit are invalid for want of invention.

A decree dismissing the bill of complaint is to be entered.