UNITED STATES *v.* J. E. BERNARD & Co., INC. (No. 4416)[1]

[1] C. A. D. 235.

United States Court of Customs and Patent Appeals, April 5, 1943

*Paul P. Rao*, Assistant Attorney General (*Richard F. Weeks*, special attorney, of counsel), for the United States.

No appearance for appellee.

[Oral argument February 4, 1943, by Mr. Weeks]

Before GARRETT, Presiding Judge, and BLAND, HATFIELD, LENROOT, and JACKSON, Associate Judges

BLAND, Judge, delivered the opinion of the court:

In the latter part of 1940, appellee, representing the Askania Regulator Co., of Chicago, consignee, entered at the port of Chicago, merchandise invoiced as "4 vertical field balances." From the notation on the entry papers, the report of the collector, and the opinion of the court below, there seems to be some confusion as to whether the merchandise consists of complete articles or parts of articles. The report of the collector states that "The merchandise is Parts of Machines" and refers to it as "4 vertical field balances returned for duty at 40% ad valorem under Par. 360 as scientific instruments." This confusion, however, is not a matter of concern here because in that portion of both competing paragraphs of the Tariff Act of 1930 (viz, 360 and 372) involved here, parts are provided for at the same rate of duty as the complete article.

Appellee protested the classification, making the claim, among others, that the goods were dutiable as parts of machines under paragraph 372 of the act at 25, 27½, or 30 per centum ad valorem. It was alternatively claimed that the goods were dutiable under paragraph 353 at 35 per centum ad valorem. All claims except that relating to 27½ per centum duty under said machine paragraph seem to have been abandoned in the court below.

Appellee, in this court, filed no brief, nor did its counsel appear for oral argument.

The trial court sustained the claim of the protest that the goods were dutiable at 27½ per centum ad valorem under said machine paragraph, whereupon the Government petitioned for a rehearing alleging that Illustrative Exhibit 1, which is a page from a catalog introduced by appellee, disclosed that the instrument of which the imported articles were parts contained a telescope and that therefore the merchandise was properly dutiable as "optical measuring instruments" under paragraph 228 (a) of said act at 60 per centum ad valorem. The trial court, without any discussion of the question, denied the motion, and the Government has here appealed from its judgment.

Among other assignments of error in this court, the Government challenges the action of the trial court in not holding that the field balances were dutiable as optical measuring instruments at 60 per centum ad valorem under paragraph 228 (a) of the Tariff Act of 1930, in sustaining appellee's protest, and in its denial of the Government's motion for rehearing. The assignment of error relating to the petition for rehearing has not been urged here by the Government, and it seems too obvious to require any discussion that there is no merit in said assignment.

The question presented is whether the collector's classification of the instant merchandise as scientific instruments (or parts of the same) is to be sustained or whether appellee's claim for classification of said merchandise under the machine paragraph 372 was properly sustained by the trial court.

The pertinent portions of the two paragraphs involved read as follows:

PAR. 360. *Scientific* and laboratory *instruments*, apparatus, utensils, appliances (including surveying and mathematical instruments), and *parts thereof*, wholly or in chief value of metal, and not plated with gold, silver, or platinum, finished or unfinished, not specially provided for, 40 per centum ad valorem; drawing instruments, and parts thereof, wholly or in chief value of metal, 45 per centum ad valorem [Italics ours]: *Provided*, That all articles specified in this paragraph, when imported, shall have the name of the maker or purchaser and beneath the same the name of the country of origin die sunk conspicuously and indelibly on the outside, or if a jointed instrument on the outside when closed.

PAR. 372. * * * all other machines, finished or unfinished, not specially provided for, 27½ per centum ad valorem: *Provided*, That parts, not specially provided for * * * of any of the foregoing, shall be dutiable at the same rate of duty as the articles of which they are parts: * * *

The testimony of but one witness was introduced. Herbert P. Niemann, representing the consignee, was called on the part of the appellee and testified in substance that the instant merchandise was used in the oil fields, especially in those of the southwestern portion of the United States, for the purpose of exploration work for the location

of oil under ground and "more specifically, for the finding of sub-surface structures where oil may have accumulated, because none of the instruments actually find oil directly." He stated that he sold the instruments and taught their use; that they were known as vertical field balances or as magnetometers; that they were shipped from Germany; that he had used them himself for locating oil strata; and that the only customers to whom they have been sold ("outside of the school, or the Bureau of Standards") are those making explorations for oil or mining companies. Then he described the involved instruments in the following language:

The Witness: The vertical field balance is also called magnetometer, because it is based in its measuring on the magnetic principle. It consists of two magnetic bars, horizontally suspended on a very sensitive bearing, and equipped with a small mirror, and a carrying body for the two magnets. The two poles of the magnet are suspended by adjustments so they are absolutely horizontal. Then the magnetometer is released at a certain station in the field which is to be explored for that purpose, and any tipping or any tilting of the magnet system as it is being affected by magnetic energies present at the surface of that particular station, will cause a deflection of the magnet system, and the magnitude of that is read on a scale on the instrument. Then the magnetometer is moved to the next and the next station, and all differences in magnetic energies at these various points are taken down, and afterwards plotted on a chart to give certain contour lines, which experienced geophysicists use for determining, or trying to determine, what sub-structure surfaces may be under those locations, rocks, domes, or any other formations that may be favorable to the accumulation of oil, or it has been used in mining work, where iron ores which are directly magnetic, are used as energy to be read and valued with this particular magnetometer. In one sentence, it is measuring the magnetic energies at any particular point of the surface of the ground. That is what it is actually doing. The information thus obtained is later interpreted in other means, but that is the purpose of the field balance itself.

By Mr. Schwartz:

Q. Do you know any other use than as just stated by you?—A. No other use except for geophysical work. None of these instruments, outside of the school, or the Bureau of Standards for calibration purposes, have been sold for any other purpose by our company.

Q. Does the vertical field balance illustrated in Plaintiff's Illustrative Exhibit 1 utilize any energy or force?—A. Yes.

Q. What?—A. The magnetic energy on the earth's surface at the particular spot where the magnetometer is set up is measured as an energy.

Q. And does anything happen to the balance, or any part of it when the energy is so utilized or applied?—A. Yes. Correctly it should be called rotating. Even if it is only a small degree of one degree of angle, still it is a rotation.

*       *       *       *       *       *       *

The Witness. I have used them myself for oil companies. The only customers these instruments have been sold to are oil companies, or companies who are doing exploration work for oil companies, or mining companies.

He also stated in substance that while he did not know the use of other similar American-made articles, he could not visualize their use in laboratories; that "Whether there is an instrument being manufactured, measuring magnetic values, used for half a dozen other purposes,

I wouldn't know, but it wouldn't have any effect or bearing on this magnctometer here in question." He said he had been with said company for about 10 years, his service beginning with the sale of instruments like those at bar.

Appellee introduced said Illustrative Exhibit 1, a drawing representing the entire device of which the imported articles are parts, but an examination of it does not disclose to us such details of its construction as to enable us to explain its structure or functions with any more clarity than that which is expressed in the quotation from witness Niemann's testimony. It is gathered, however, from the testimony and said drawing that the device of which the imported articles are parts, comprises, among other things, magnetic bars horizontally suspended on a sensitive bearing, and that there are two poles of the magnets so suspended; that the tilting or tipping of the magnetic system as it is affected by the magnetic energy emanating from the earth causes the magnet to deflect, and the magnitude of this deflection is, by operation of the elements of the device, disclosed on a scale on the instrument, which may be read by the geophysicist and used in trying to determine the character of sub-surface structure having relation to deposits of minerals. It is to be noted that the devices, of which the articles at bar are parts, are rather large, substantial, and complex in character, the net entered value of the imported merchandise being 5,261.80 Reichsmarks.

The Government here urges that the proof is not sufficient to overcome the presumption attaching to the classification of the collector "that devices similar to the involved magnetometers were chiefly used in pure science immediately prior to the enactment of the Tariff Act of 1930." All the testimony in the record having any bearing whatever upon the utility of the instruments, of which the imported articles are parts, is to the effect that they are not chiefly used in pure science. Without belaboring the issue, we think that the witness having testified that he sold and taught others to use these articles in commercial pursuits for 10 years, that he knew of nothing similar being used in any other pursuits, and that the ones at bar and others like them sold by him were used for no other purpose than commercial pursuits (except as above quoted) would seem to make a *prima facie* case that articles of the class to which the imported articles belong were not chiefly used or designed for use in pure science on the date of the passage of the said tariff act but were designed for use and chiefly used at said time in applied science. Certainly if they, or the class to which they belong, had a major use in pure science, the Government had ample opportunity to rebut the testimony of the importer. We think under the circumstances we are fully justified in sustaining the view of the court below, who weighed the evidence and held in substance that the devices were not chiefly used in pure

science and that they "are neither scientific nor laboratory instruments within the meaning of paragraph 360 of the Tariff Act of 1930." The court below properly based its holding upon the decision of this court in *W. L. Conover* v. *United States*, 17 C. C. P. A. (Customs) 324, T. D. 43743. There are a number of other cases to the same effect.

It was the duty of the appellee to prove not only that the classification of the collector was erroneous but also that the claimed classification relied upon was correct. The trial court held that the instant articles were "mechanical contrivances which utilize, apply, or modify the energy or force of terrestrial magnetism for the transmission of motion," and it cited this court's decision in *Simon, Buhler & Baumann (Inc.)* v. *United States*, 8 Ct. Cust. Appls. 273, T. D. 37537.

The Government insists here that the magnetometers here under consideration are not machines within the meaning of paragraph 372 for the reason that the devices are things upon which magnetic energy operates, and that magnetic energy is a natural force, as is gravity, chemical affinity, catalysis, condensation, and osmosis, and that anything which is so operated upon without mechanical manipulation or assistance is not a machine. The Government states that it is impossible to distinguish the instant case from the decision of this court in *United States* v. *Race Co.*, 22 C. C. P. A. (Customs) 327, T. D. 47362, which involved dialysers, used for the extraction of pure caustic soda from a solution of impure caustic soda. The device there consisted of a tank, grids, wire-mesh nets, etc., and operated upon the principle of osmosis. The process pulled the caustic soda out of a solution, leaving the impurities. This court there held that the dialysers were not machines; that they were merely receptacles and nothing more than tanks. We think that case can easily be distinguished from the instant case. The process of osmosis imparted no motion to any part of the dialyser. The dialyser did not utilize energy. It merely held the impure caustic solution while osmosis did its work. It did not apply energy or force or modify it. In the instant case a natural force, magnetism from the earth's surface, imparts motion to the physical elements of the machine in such a way that upon a dial is indicated, by virtue of such motion, certain important data.

In the *Simon, Buhler* case, *supra*, the court was concerned with certain frames, plates, and posts, which were materials ready to be assembled as parts of a mash filter. The question was whether or not they were machine parts. The court held that they were not parts of a machine because a mash filter was not a machine, for the reason that it was not "a mechanical contrivance for utilizing, applying, or modifying energy or force or for the transmission of motion"

and cited the Standard Dictionary, Webster's New International Dictionary, and Lockwood's Dictionary of Mechanical Engineering Terms.

This court has had occasion to point out in other decisions, e. g., *United States* v. *Guth Stern & Co., Inc.*, 21 C. C. P. A. (Customs) 246, T. D. 46777, that in the *Simon, Buhler* case the court was not concerned with laying down any "precise and all-inclusive definition of the term 'machine' for tariff purposes," and we have stated that the opinion itself did not purport to do so. It was pointed out that certain characteristics of a machine which have been noted in various authorities were not present in the filter material involved in the *Simon, Buhler* case.

Since the decision in the *Simon, Buhler* case, this court has frequently been confronted with very close questions relating to the determination of what constitutes a machine and has even been called upon to consider a claimed distinction between "machines" and "machinery." The term "machine" is broadly defined in some authorities and more narrowly defined in others. In Webster's New International Dictionary, referred to in the *Guth Stern & Co.* case, *supra*, we find the following:

> * * * According to the strict definition, a crowbar abutting against a fulcrum, a pair of pliers in use, or a simple pulley block with its fall, would be a machine, but ordinary usage would hardly include such as these; while an implement or tool whose parts have no relative movement, as a hammer, saw, chisel, plane, or the like, would not, of itself, in any case be a machine. Popularly and in the wider mechanical sense, a machine is a more or less complex combination of mechanical parts, as levers, cog and sprocket wheels, pulleys, shafts, and spindles, ropes, chains, and bands, cams and other turning and sliding pieces, springs, confined fluids, etc., together with the framework and fastenings supporting and connecting them, as when it is designed to operate upon material to change it in some preconceived and definite manner, to lift or transport loads, etc.

In view of the kind of machines Congress specifically referred to in paragraph 372, and taking into cognizance the more applicable definitions found in the lexicographical authorities as applied to the term "machine" when referred to in a tariff sense, we think that for an importation to respond to that term it must be something more than a "crowbar," "a pair of pliers," or, as was said in the *Simon, Buhler* case, "a kitchen colander or a box of sand for clearing muddy water." It is our opinion that a machine such as Congress had in mind must have some movable parts, and it must do some of the things pointed out in the *Simon, Buhler* case. We have so held in decisions hereinafter referred to.

The case that seems most in point by reason of the similarity of the articles involved and the manner of their operation is *United States* v. *L. Oppleman, Inc.*, 25 C. C. P. A. (Customs) 168, T. D. 49271. There we had before us aneroid barometers. The barometer operated

by atmospheric pressure through a diaphragm which caused levers to work upon other levers and a chain.  By the motion of said elements, an indicator needle was caused to show the atmospheric pressure on a dial and whether such pressure was falling or rising.  It contained a hairspring and, in all, nine parts that moved with atmospheric pressure changes.  It was the contention of the Government there, just as it is here (and we quote from the opinion), that "The dial and the parts contained in the barometer are not operated by any human or mechanical means but by certain forces of nature and there is nothing that a man or a machine can do which can affect the direction of the wind, the force of the wind, or the moisture in the air, which three forces, singly or in combination, react upon and affect the aneroid barometer." In holding that the barometers were machines, we said:

The aneroid barometers here involved operate in accordance with mechanical principles.  That they are mechanical contrivances, having operating movable parts, such as springs, hairsprings, levers, chains, and diaphragms, without which parts and their coordinate movements the articles would not function, cannot be seriously questioned.  They are somewhat like weighing or computing scales which are clearly machines, and were held to be dutiable as such under paragraph 372 of the Tariff Act of 1922 by the Board of General Appraisers (now United States Customs Court) in the case of *C. J. Tower & Sons* v. *United States*, T. D. 40876, 47 Tieas. Dec. 569, which decision was called to the attention of the Congress during its consideration of paragraph 372 of H. R. 2667, which later became paragraph 372 of the Tariff Act of 1930.  See Summary of Tariff Information, 1930, Vol. 1, p. 841.

As we understand the argument of counsel for the Government it is, in the final analysis, that the involved articles are not machines, within the purview of paragraph 372, *supra*, because their operation depends upon *natural energy and force* [italics not quoted], rather than upon energy or force artificially produced and actuated.

The fallacy of that argument is exposed, we think, when it is recalled that various kinds of complicated machines are operated by water power (running streams, falling water, and the tides), such, for example, as milling machines. Certainly, a windmill is no less a machine simply because it is operated by a natural force—the wind.

We are of opinion that the question of whether the involved articles are machines within the purview of paragiaph 372, *supra*, does not depend upon the source of the force or energy which motivates them, but rather upon the character and operation of the articles themselves.

We think it is clear from what has been said that the involved articles are mechanical contrivances which utilize and apply energy or force, and are, therefore, machines.  It is true, they do not apply energy or force or transmit motion to some other device, but neither do cash registers, *eo nomine* provided for in paragraph 372, *supra*, radio receiving sets, held to be machines in the case of *United States* v. *Janson Co.*, *supra*, or weighing or computing scales, held to be machines in the *C. J. Tower & Sons* case, *supra*, and many other machines which we need not enumerate here.  * · *  *

It was argued there by the Government that this court's decision in *United States* v. *Alexander McNab*, 21 C. C. P. A. (Customs) 406, T. D. 46928, was controlling.  We held to the contrary.  And, we

do not think it is controlling of the decision in the instant case. In the *McNab* case, torsion meters were involved. They were described in the court's opinion as follows:

The said merchandise was described by appellee's witness as consisting of torsion meters used to determine the horsepower of the engine of a vessel transmitted through the propeller shaft. Each torsion meter weighs approximately 1,020 pounds, is about five or six feet long, cylindrical in form, is attached to and surrounds the propeller shaft inside of the vessel, in the space provided for said shaft. As the propeller shaft revolves, the torsion meter revolves with it, and two mirrors set in the torsion meter, one stationary and one movable, cast a reflection from a light upon a scale; from this scale the horsepower transmitted through the shaft is arrived at by applying a certain mathematical formula. *The torsion meter has no operating function of its own which sets itself in motion, but is revolved by the propeller shaft.* [Italics not quoted.]

We held that that device was not "a mechanical contrivance for utilizing, applying, or modifying energy or force, or for the transmission of motion, within the meaning of those terms as used in the leading case of *Simon, Buhler & Baumann, Inc.* v. *United States*," *supra*. It was there pointed out that the torsion meter did not in any way modify or utilize the energy or force that was applied to it from the propeller shaft. A wholly different situation prevails here. The magnetic force or energy imparted to the device is utilized by the device and transmitted to other portions of the same in such a way as to bring about a desired result. The device has various movable parts and comports generally with what the lexicographers ordinarily say characterizes a machine.

The Government cites the definition of a machine found in "Robinson on Patents," section 173, which was referred to by the Circuit Court of Appeals, Sixth Circuit, in *Frederick R. Stearns & Co.* v. *Russell*, 85 Fed. 218, 225. The definition reads as follows:

* * * an instrument composed of one or more of the mechanical powers and capable, when set in motion, of producing, by its own operation, certain predetermined physical effects.

Circuit Judge Taft, in said opinion, also quoted Robinson as saying that "a machine differs from all other mechanical instruments in that its rule of action resides within itself." We see nothing inconsistent in those definitions with the conclusion we have herein arrived at with reference to the instant merchandise. The machine here under consideration, by the use of a natural force, which is a power and an energy, mechanically, through the operation of a delicate bearing which permits the tipping or tilting, brings about the recording of a predetermined physical effect. This, we think, characterizes the kind of machines that Congress provided for in paragraph 372. Again, the instant instrument comports with Robinson's said statement that a machine differs from all other mechanical instruments in that its rule of action resides within itself. That statement could not

possibly mean that a machine must necessarily furnish its own power. The rule of action of the instant device is within itself. Its operation depends upon the application of power and the amount applied. The same can be said of a windmill (which unquestionably is a machine). It does not operate itself; the wind operates it. A typewriter does not operate itself; the operating force comes from without. The same is obviously true of a cash register, which is specifically mentioned in paragraph 372.

The Government also points to the case of *United States* v. *Klingerit, Inc.*, 17 C. C. P. A. (Customs) 472, T. D. 43931, in which we held that metal valves which regulated the quantity of steam and liquid which might flow through them were not machines. We pointed out that the valves "do not of themselves apply that force to the object upon which it operates." The instant article, through movable parts, utilizes magnetic force and applies such force to the indicating means, which brings about the desired result. We do not think the *Klingerit* case is in point.

While the case of *United States* v. *Dyson Shipping Co., Inc., et al.*, 29 C. C. P. A. (Customs) 148, C. A. D. 184, was referred to in oral argument, it is not seen how the holding there is particularly pertinent to a decision of the instant issue. That case involved a dental chair, which was lowered and raised by the operation of a pedal pressed by the foot. We held that the chair utilized energy and modified it and was therefore a machine.

We have also examined the following cases: *United States* v. *Wm. Goldenblum & Co.*, 18 C. C. P. A. (Customs) 367, T. D. 44616; *United States* v. *Adler-Jones Co.*, 20 C. C. P. A. (Customs) 397, T. D. 46231; and *United States* v. *J. E. Bernard & Co., Inc.*, 28 C. C. P. A. (Customs) 182, C. A. D. 142.

In the *Goldenblum* case it was held that ordinary carpenters' braces, used for turning boring bits or drills, did nothing more than perform a function of leverage and were not machines.

The *Adler-Jones* case involved "a figure in the nature of a manikin representing the form and features of 'Mr. Jiggs'." It was there held that the manikin was not a machine because the mechanical device which caused the swinging or rocking of the body and head was "but a small part of the figure and affects only a portion thereof," and did not respond to the general definitions of a machine as such definitions were applied in the *Simon, Buhler* case.

The *Bernard & Co.* case involved filters used for the clarification of certain liquids, consisting of a frame, plates, and sheets. It was there held that the devices possessed no mechanical operating features and were therefore not machines.

For the reasons hereinbefore stated, we think the trial court arrived at the correct conclusion in sustaining appellee's protest and

in holding the instant merchandise dutiable under the said machine paragraph 372 at 27½ per centum ad valorem. The judgment appealed from is accordingly *affirmed.*